PROUDFIT LOOSE LEAF CO. et al. v. KALAMAZOO LOOSE LEAF
BINDER CO.
KALAMAZOO LOOSE LEAF BINDER CO. v. PROUDFIT LOOSE LEAF
CO. et al.

(Circuit Court of Appeals, Sixth Circuit. December 15, 1915. On Rehearing,
March 7, 1916.)

Nos. 2601–2604, 2645.

1. PATENTS ⬦328—VALIDITY AND INFRINGEMENT—LOOSE LEAF BINDER.
    The Bushong patent, No. 941,757, for a loose leaf binder, claims 13, 15, 16, were not anticipated, disclose patentable invention, and are valid; also *held* infringed.

2. PATENTS ⬦109—VALIDITY—CLAIMS INTRODUCED BY AMENDMENT.
    A claim of a patent introduced into the application by amendment is not invalid because its substance was not contained in the original application in the form of a claim or claims, but it is sufficient if it was disclosed by the specification.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 152; Dec. Dig. ⬦109.]

3. PATENTS ⬦26—"INVENTION"—NEW COMBINATION OF OLD ELEMENTS.
    Although every element of a patented combination was old, "invention" still exists, if the combination either produces a new and useful result or effects an old result in a new and materially better way.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. ⬦26.

    For other definitions, see Words and Phrases, First and Second Series, Invention.]

4. PATENTS ⬦16—INVENTION—QUESTION OF FACT.
    Whether the device of a patent involves invention, as distinguished from mechanical skill, is a question of fact.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 14, 15; Dec. Dig. ⬦16.]

5. PATENTS ⬦326—VIOLATION OF INJUNCTION—DISTINCTION BETWEEN CIVIL
    AND CRIMINAL CONTEMPT—GOOD FAITH.
    Advice of counsel and good-faith conduct do not relieve from liability for a civil contempt, although they may affect the extent of the penalty; but the mere violation of an injunction against infringement of a patent,

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in the belief in good faith that the order is being properly interpreted, and without any intention to disobey it, is not a criminal contempt, even though actuated by a desire to find a lawful means of avoiding infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 613–619; Dec. Dig. ☞326.]

6. PATENTS ☞326—VIOLATION OF INJUNCTION—APPEAL OR ERROR—AFFIRM-ANCE IN PART AND REVERSAL IN PART.

A court adjudged defendants in an infringement suit guilty of contempt for violation of an injunction, and awarded one-half the fines imposed to complainant as reimbursement for its damages, costs, and expenses. *Held* that, in so far as the order was for the benefit of complainant, it was civil, but as to the remainder of the fines it was of a criminal nature, and that, where the opinion of the court indicated that it did not intend to find defendants guilty of a willful and contumacious disregard of its authority, upon a writ of error to review the order generally, the criminal portion of the judgment should be reversed, but in so far as it was remedial it should be affirmed.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 613–619; Dec. Dig. ☞326.]

7. PATENTS ☞328—VALIDITY AND INFRINGEMENT—LOOSE LEAF BINDER.

The Bushong patent, No. 851,276, for a loose leaf binder, claims 36, 39, 46, 47, 48, 49, 50, 51, and 52, *held* valid, but not infringed.

8. PATENTS ☞328—VALIDITY AND INFRINGEMENT—LOOSE LEAF BINDER.

The Bushong patent, No. 878,340, for a loose leaf binder, claims 13, 14, and 24, held valid and infringed; claims 18, 22, and 23 *held* valid but not infringed; and claim 19 *held* void, as too broad, in view of the prior art.

9. PATENTS ☞20—INFRINGEMENT—IDENTITY OF RESULT.

Infringement is not avoided by combining two elements of the patented structure into one unitary structure, so long as each element operates in substantially the same way to produce substantially the same result.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 20–22; Dec. Dig. ☞20.]

10. PATENTS ☞238—"INFRINGEMENT"—OMISSION OF ELEMENTS.

A combination claim is not infringed, if one of its elements is omitted, without the substitution of an equivalent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 376; Dec. Dig. ☞238.

For other definitions, see Words and Phrases, First and Second Series, Infringement.]

11. PATENTS ☞165—CONSTRUCTION OF CLAIMS.

An element cannot be read into a claim, for the purpose of narrowing it, and thus making it valid, as against objection that it is too broad, in view of the prior art.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. ☞165.]

On Rehearing:

12. PATENTS ☞109—AMENDMENT OF APPLICATION—NEW OATH.

Where a claim added to an application for a patent by amendment had previously been a part of another application by the same applicant, and was in interference proceedings, in which, after a hearing, he was awarded priority of invention, and then transferred the claim to the application

for the patent in suit, the specification of which covered the subject-matter, his failure to make a new oath after the amendment did not invalidate the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 152; Dec. Dig. ⬅109.]

Appeals from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Suit in equity by the Kalamazoo Loose Leaf Binder Company against the Proudfit Loose Leaf Company and another. From the decree, all parties appeal; and defendants seek by writ of error to review an order imposing fines for contempt. Affirmed on appeal of plaintiff, reversed in part on appeal of defendant named, and reversed on writ of error by defendants as to criminal feature of contempt, but affirmed in other respects.

F. L. Chappell and O. A. Earl, both of Kalamazoo, Mich., for complainant.

Cyrus W. Rice, of Grand Rapids, Mich. (H. C. Lord, of Erie, Pa., of counsel), for defendants.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SATER, District Judge.

KNAPPEN, Circuit Judge. Nos. 2601 to 2604, inclusive, are appeals and cross-appeals, respectively, from the decrees of the District Court in infringement suits upon three separate Bushong patents owned by the Kalamazoo Loose Leaf Binder Company. The writ of error in No. 2645 is brought to review an order of the District Court adjudging the Proudfit Loose Leaf Company and certain individuals guilty of contempt in violating the order and injunction of the court below with respect to one of the patents. The cases were heard together in this court, and will be disposed of in one opinion.

The patents all relate to improvements in loose leaf binders. In the order of application therefor they are: No. 941,757, applied for March 21, 1903, issued November 30, 1909; No. 851,276, applied for August 5, 1904, issued April 23, 1907; No. 878,340, applied for December 31, 1906, issued February 4, 1908. These patents will be spoken of as the "first," "second," and "third" patents, respectively, in order of date of application. As is apparent, all three applications were pending in the Patent Office at the same time.

The inventions of the three patents relate, broadly speaking, to the binding devices, including the covers, of loose leaf account books of the type in which the sheets are detachably mounted, through slots in their binding edges, upon binding cords or binding strips extending into the covers of the book, the cords being adjusted by mechanism located within the covers.

### The First Patent.

[1] The first patent (No. 941,757) has 16 claims, Nos. 13, 15, and 16, printed in the margin,[1] being the only ones involved here. Claims

---

[1] "13. In a loose leaf binder, the combination of a pair of swinging covers, one of which is provided with an internal recess or chamber, binding strips

2 to 12, both inclusive, include as a prominent element an automatically adjustable back, one edge of which telescopes into a pocket in the adjacent cover; the other edge being rigidly connected to the other cover. Neither of the claims in suit involves this adjustable back feature. Claim 14 differs but slightly from the claims in suit, all of which the District Court held valid and infringed. The original application contained no claims upon the features of claims 13 to 16 which distinguish them from all other claims, viz.: The inclusion of the strip-adjusting mechanism within a recess or chamber in the cover of the book, and its arrangement or adaptation for being operated from the outside of the cover (and thus the outside of the book) without opening or uncovering the chamber containing the strip-adjusting mechanism. Claim 13 was formulated, at the suggestion of the Patent Office, during the pendency of still another application of Bushong, interference declared as between Bushong, Proudfit and two other applicants; the claim being, at Bushong's suggestion, for the purpose of getting advantage of earlier filing date of application, included within what we call the first patent. Priority was awarded Bushong, as against Proudfit (the two other parties having dropped out), through the successive actions of the examiner of interferences, the board of examiners in chief, and the Commissioner. Claims 14, 15, and 16 were thereupon added.

[2] It is urged that the distinguishing elements of the claims in suit were not disclosed in the application, and that therefore these claims are invalid under section 4888 of the Revised Statutes, which requires the inventor to "particularly point out and claim the part, improvement, or combination which he claims he has invented or discovered." The authorities most relied upon in support of this claimed invalidity are Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586, the decisions of this court in Michigan Central R. R. Co. v. Consolidated Co., 67 Fed. 121, 14 C. C. A. 232, and American Lava Co. v. Steward, 155 Fed. 731, 736, 84 C. C. A. 157, and the decision of the Supreme Court affirming the American Lava Co. Case, 215 U. S. 161, 30 Sup. Ct. 46, 54 L. Ed. 139.

In our opinion the case is not brought within the statute or the decisions cited, for we think the subject-matter of the claims in suit is

to which the loose leaves are secured extending between the covers, and adjusting mechanism for the strips situated within said recess or chamber in the cover, and arranged to be operated from the outside of the chamber without opening or uncovering the same."

"15. In a loose leaf binder, the combination with a pair of covers, one of which is provided with an internal recess or chamber, of binding strips to which the leaves are secured extending between the covers, and an adjusting screw for said strips situated within said recess or chamber in the cover and adapted to be manipulated from without the same by means of a key."

"16. In a loose leaf binder, the combination of a pair of covers, one of which is provided with an internal recess or chamber, binding strips to which the leaves are secured extending between the covers, and an adjusting mechanism for the strips situated within said recess or chamber in the cover and adapted to be operated by means of a key without opening or uncovering the chamber."

disclosed by the original application. Fig. 1 of the drawings (which we herewith reproduce) suggests a recessing of the adjusting mechanism in the cover and its operation by a key from the outside; no means

Fig. 1.

of operating from the inside being shown. The specification, moreover, expressly states that the adjusting angle bar is contained within "a rectangular cavity" in one of the covers, and describes the angle bar and its adjustment by means of a screw rod in a guide bar inserted in the threaded perforations in the angle bar; it being also said that the "outer end" (which can only mean the end outside the cover) of the screw rod is "provided with a head adapted to receive the key $l$," which appears in the drawing. It is obvious that if the "binding cords are contained in longitudinally extending cavities provided in both sections of the cover," and if the angle bar is in the "rectangular cavity," so must be the adjusting mechanism, including the screw rod and the guide bar. The original application was accompanied by the usual inventor's oath. Unless, therefore, the claims are invalid because their substance was not contained within the original application, *in the form of claims,* as distinguished from disclosure by specifications, the claims are not subject to the objection stated. The authorities cited do not, in our opinion, sustain such proposition. In each of them the amendment held not to be covered by the original oath was made in the specifications themselves. In the instant case no amendment of the specifications in the respect stated was either necessary or in fact made. We cannot think the omission to specifically include the features in question within the statement of the "characteristic features" of the invention is fatal to the validity of an otherwise complete disclosure, especially in view of the broad statement of the nature of the invention as relating "to the binding device, and also to the covers of loose leaf account books," and that "it has for its object to eliminate certain inconvenient and objectionable features common to books of this kind"—the disclosure of the adjusting mechanism before referred to occurring in the statement of "the devices employed for * * * accomplishing said objects."

The defenses requiring most consideration are anticipation and lack of invention in view of the prior art. The art of temporarily binding loose leaves or sheets was not new when Bushong entered the field, and (with one exception) each individual element of the combination of each of the three claims in suit is, broadly speaking, found in the prior art, by at least more or less substantial equivalents. But we find no reference in the prior art showing a complete anticipation either of the entire combination of either of the three claims in suit, or even of what we have spoken of as their distinguishing elements, viz. the inclusion of the strip-adjusting mechanism within a recess or chamber in the cover of the book arranged or adapted for being operated from the outside of the cover, without opening or uncovering the chamber containing such mechanism.

The reference regarded by defendant's expert as most clearly resembling the invention of the claims in suit is that of England—No. 194,230 (1877)—who discloses a spring within a recess of one cover of a file or binder for letters, periodicals, etc. The binding cords are attached to the free end of the spring, passing through eyelets in the binding edge of the cover and through an index secured to the opposite cover. A strap extends from the free end of the spring to the front edge of the cover. Claim 13 of the first Bushong patent reads literally upon England, although this is not true of claims 15 and 16. However, England does not in form or substance disclose the essence of Bushong's device. For example, England's strap has nothing to do with adjusting the tension of the binding strips relatively to the leaves, except that manually pulling upon it relaxes the tension of the spring; the strap serving also to bring together and fasten the two covers of the file when closed. It is in no proper sense the key of Bushong. The adjusting mechanism is not designed to preserve a uniform tension of the binding strips, nor does it effect such result. On the contrary, the mechanism is such that, necessarily, the greater the thickness of the' contents of the file the greater the tension of the spring, and vice versa. Moreover, it is not clear that England's cords were "secured" to "loose leaves," except as the contents of the file are held between the members of a so-called "index"; that is to say, it is not clear that the cords pass through the filed papers. It plainly lacked utility as respects loose leaf ledger work, as it had little, if any, adaptability to use in connection with strips or cords carrying the detachable leaves of an otherwise substantially and permanently bound book.

Rosenthal, No. 583,335 (1897), disclosed in an expansible binding, "adapted to be used in connection with account books or with periodicals, or any other such books which require to be bound together," a series of removable leaves, their rear edges having rectangular notches (adapted to receive the binding strips) and perforations corresponding to those upon metallic bars placed at the rear margins of the leaves, both on the outside of the outer leaves and at intervals between the leaves; the bars having pins and holes registering with pins and holes in the other bars, as well as slots through which also the binding strips pass, thus holding the leaves and bars tightly together. He shows a pair of swinging covers (pivoted, respectively, to the two plates form-

ing the back of the book) and an adjusting mechanism for the strips situated in a recess in one of the covers. His adjusting mechanism (as shown by Fig. 4, herewith reproduced) consists of a notched bar (at-

*Fig 4*

tached to a crosshead to which the binding strips are fastened) made to slide through guides by the operation of a lever pivoted to the cover, whose notched end engages the teeth of the bar, and whose other end, for the purpose of such engagement or disengagement, is manually swung within the limits of a semicircular bar. But Rosenthal did not anticipate Bushong, for his adjusting mechanism was. arranged to be operated only from the inside of the cover. Indeed, it would seem that his mechanism did not (in case of considerable variation in thickness of the book) effect a complete automatic adjustment of binder strip tension; it being necessary, in such case, to manually shift the point of attachment of crosshead upon binding strips.

Nott, No. 648,987 (1900), discloses (in a compressing or clamping device for the purpose of a temporary binder for loose sheets of paper or for account books) a base on which the sheets rest, having on the upper side, at the inner margin, a binding plate or clamp, with transverse perforations therethrough at the respective ends of the binding plate, through which perforations flexible bands, preferably of metal, pass either across the side edges of the sheets or through slots in the same, into a recess in the base, where they connect with carriages in the form of nuts upon a screw operated by a key without the chamber. Nott's device was not adapted to loose leaf ledger purposes. It was practically merely a clamping device, and not a book. It had no pair of covers, for its clamping member was in no sense a cover, and its base was not strictly such. While his adjusting device, which was merely for tightening the clamping strips, was operated from the out-

side, it was not in what would be called the cover (treating the device as a book), but in the back.

While the devices of England, Rosenthal, and Nott are by no means the only ones pertinent upon the questions of anticipation and invention, they are the most prominent; and unless anticipation is found in one or more of these devices, it is not, so far as appears from this record, to be found in the prior art. We think anticipation of the claims in suit is not shown.

The more serious question is whether these claims involve invention in view of the prior art. In view of that art and the history of the application in question in the Patent Office (including the applicant's acquiescence in the rejection of his original claim 1, and the amendment made to claim 16), the District Judge held that "the vital and novel feature of the invention embodied in each of the three claims in suit is the means for operating and the operation of the adjusting mechanism, contained within the chamber of the cover, from without the cover, and without opening or uncovering the chamber," and that the claims so restricted are valid.

[3] Taking the entire record into account, we are disposed to the view that these claims, as narrowly limited by the District Court, involve patentable invention. If every element was old, invention would still exist if the combination either produced a new and useful result. or effected an old result in a new and materially better way. Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; Ferro Concrete Constr. Co. v. Concrete Steel Co. (C. C. A. 6th Cir.) 206 Fed. 666, 669, 124 C. C. A. 466. Again, conceding that it would not have been invention merely to provide for operating Rosenthal's adjusting mechanism from the outside in connection with the method of construction and operation of his book as disclosed, nor merely to substitute a removable key for Nott's integral key, it does not follow that there was no invention in the conception of Bushong's device.

[4] Whether the inclusion of the novel features which were held to distinguish Bushong's conception involve invention, as distinguished from mechanical skill, is a question of fact. Herman v. Youngstown Co. (C. C. A. 6th Cir.) 191 Fed. 579, 582, 112 C. C. A. 185; Ferro Concrete Constr. Co. v. Concrete Steel Co., 206 Fed. at p. 668, 124 C. C. A. 466. As bearing upon this question of fact, it may be noted that Bushong made his first application nearly 6 years after the issue of Rosenthal's patent, nearly 3 years after Nott, and more than 25 years after England, without the complete adaptation of the devices of either of those patents to loose leaf binding strip ledgers; and notwithstanding the great development in the loose leaf binder art, especially since 1877, the record indicates that when the testimony in this case was taken no structure of the Rosenthal, England, or Nott patents was upon the market.

The structure which Bushong has produced (and to which the devices of the claims in suit here materially contribute) constitutes a loose leaf ledger (as distinguished from a mere clamping or compressing device, such as Nott), having binding strips (as distinguished from post, ring, or purely string construction), a pair of covers (as distinguished

from the base and clamp of Nott), into and between which covers the binding strips extend operating as hinges for the covers (as distinguished from the attachment of Rosenthal's covers to the back of the book), one of the covers having a recess therein (as distinguished from the back) containing the adjusting mechanism mentioned, this mechanism being completely operable from the outside (when the book is either open or closed) by means of a key (as distinguished from England, whose mechanism was not adjustable in the sense of the patent in suit, and from Rosenthal, whose adjusting mechanism was incapable of being operated from the outside), the whole comprising a complete, convenient, and permanently bound volume.

There are obvious advantages in a mechanism arranged to be operated only from the outside and by means of a key (as applied especially to commercial ledgers), first, in permitting complete and compact adjustment and alignment of the leaves; second, in retaining such alignment and preventing sagging when the ledgers are in storage, and when being handled back and forth in connection with their use; and, third, in the absence of a rigid, protruding end of an adjusting shaft, when not being actually operated. The utility of the device is beyond dispute, for not only Proudfit, but two other applicants besides Bushong, claimed in the interference proceeding priority of invention. Moreover, while the favor with which a device has been received by the public cuts no figure, where lack of invention is clear, such favorable reception may in a doubtful case determine the existence of invention. Cincinnati Traction Co. v. Pope (C. C. A. 6th Cir.) 210 Fed. 443, 449, 127 C. C. A. 175, and cases cited. A prominent blank book manufacturing company was so impressed with the value of Bushong's invention that it bought early in 1904 a half-interest in the patents and took similar interest in the manufacture. The binder was favorably received by the trade, and has continued to meet with favor. Indeed, it seems to be conceded that the ledgers of Bushong and Proudfit are in a class by themselves, without competition in their particular field, as distinguished from loose leaf binders of post, string, or ring construction; and the effect of this situation is not entirely overthrown by the fact that post binders, which are much less expensive than either Bushong's or Proudfit's, still supply 90 per cent. of the loose leaf ledger trade; nor by the fact that until the clamping device of Bushong's second patent was added his book was not highly successful commercially, because of the wear of the edges of the covers upon the binding edges of the leaves, and their consequent wear and displacement.

We are not impressed with the contention that a double patenting of the claims in suit resulted from the fact that the combination of claim 23 of patent No. 914,383 to Bushong contains as an element a cam in an adjusting mechanism, of a different nature from that of the patent in suit, arranged to be "adjusted from the outside of the cover," and that the combination of claims 18 and 25 of patent No. 878,340 to Bushong each contained as one element an adjusting member contained in the cover. This means, at most, that each of two prominently distinguishing elements of the claims in suit (but not both)

had been an element of a different patented combination; that is to say, that each of the two elements in question was old. The authorities cited do not in our opinion sustain the contention that double patenting resulted from such situation. We think the claims, construed and limited as stated, are valid.

*Infringement of First Patent.*—We think it clear that the claims in suit, if valid, are infringed. Defendant's binder has the swinging covers, binding strips to which the leaves are secured extending between the covers, an adjusting mechanism for the strips situated within a recess or chamber in one of the covers, and arranged to be operated from the outside of the chamber by means of a key, and without opening or uncovering the chamber. In both devices the covers swing on the binding strips as hinges. The prominent differences between the two structures are these:

(a) Instead of the adjustable back of Bushong, defendant employs a metallic, removable, spring back, only partially adjustable; the idea being to vary the width of the back to correspond with the thicknesses of the leaf-body. The form of back is not involved in the claims in suit.

(b) Plaintiff uses stiff leather binding strips, originally in the form of round thongs, latterly made flat, of double material, and stitched. Defendant uses two or more layers of thin, flexible, steel bands or ribbons. In both structures the binding strips are attached directly to a cross-head forming a part of the adjusting mechanism.

(c) In plaintiff's device a key inserted in the front edge of the cover engages the head of a screw shaft, whose revolution directly actuates the crosshead longitudinally to the cover. Defendant's device employs, in the place of a screw shaft, a bell crank and worm; a key inserted in the lower edge of the cover engages the head of the worm, the thread of, which engages the geared segment of the short arm of the bell crank, the revolution of the worm (which lies transversely of the cover) moving the short arm of the bell crank, and thus the crosshead to which the longer arm of the crank is attached. We think defendant's worm and bell crank mechanism the equivalent of plaintiff's screw mechanism.

(d) Defendant's covers have a thin, metallic rear extension edge, a fraction of an inch wide, the metallic binding strips thus entering the thick covers a little forward of the strip-engaging perforations in the leaf-body. As a result of the feature last mentioned, together with the flexible springlike action of the binding strips, perhaps contributed to by the spring back, an arching of the springs is created, resulting, when the book is closed, in a convex arrangement of the rear edges of the leaves and a concave arrangement of the front edges; and, when the book is opened, a concave arrangement of the rear edges of the leaves, elevating the rear ends of the same; thus giving the distinctive appearance and operation of an ordinary spring-back bound book. The metallic springs probably are given, by the loosening of the adjusting mechanism, a slight thrusting effect, not so clearly received by plaintiff's leather strips. Defendant's steel strips in the movement stated may be an improvement upon plaintiff's leather strips, including their cover connection; but in our opinion they are in principle and spirit

230 F.—9

an equivalent, and do not so far employ a different method, or perform a different function, as to escape infringement.

We think each of the three claims in suit infringed by defendant.

### The Contempt Proceeding.

Previous to the decree below defendant's key-lock binder had a cardboard flap extending (from the rear edge of the cover) over the adjusting mechanism, cloth-hinged to the cover at a little distance from its outer edge, and otherwise unsecured, as shown by reduced photograph (Fig. 1) below. Since the decree and service of injunction defendant company has marketed the enjoined infringing devices in the same form as condemned by the decree, with this exception: It has cut the cover flap from its binders on hand, and instructed its selling agents to take the same course with those in their hands; its new binders have been made without the cover flap, as shown by reduced photograph (Fig. 2) below.

Fig. 1.                    Fig. 2.

The District Court held the defendant company, its president, its vice president, and its secretary and treasurer guilty of contempt in so doing, and imposed upon each a fine of $150.

Plaintiffs in error insist that the removal of the cover flap avoids infringement, according to both the plain meaning of the patent and the District Court's construction of that meaning; that the call in the claims for a housing of the adjusting mechanism in an "internal recess or chamber" in the cover, coupled with the clause "arranged to be operated from the outside of the chamber without opening or uncovering the same" necessarily means a chamber "entirely inclosed within one cover of the structure," "one having a cover and one not already opened"; and that defendants, in removing the flap, "removed the cover with the internal recess or chamber"—that is to say, that they have thus removed the recess itself. It is urged that this conclusion necessarily results from the court's characterization of the novel feature of the invention embodied in the claims in suit as "the means for operating and the operation of the adjusting mechanism, contained

within the chamber of the cover, from without the cover without opening or uncovering the chamber." Further confirmation of this view is sought in the fact that the District Judge approved as substantially accurate a description by complainant's counsel of the mechanism of the patent, containing the statement that "the adjusting mechanism is entirely inclosed within the covered chamber"; and plaintiffs in error say that, now that the cover flap is removed, the recess containing the mechanism is not "internal even in the sense of being wholly contained within the inner surface of the cover." (It is in fact wholly contained within the inner surface of the cover, as defined by the upper surface of its framework and margins.)

The District Judge rejected this interpretation of his opinion and decree and the stated construction of the patent, and thus the claimed noninfringement by defendant's binder without the cover flap. We agree with the District Judge. We think defendant's interpretation sacrifices spirit to letter, substance to mere form. There is, we think, no merit in the suggestion that either a recess or a chamber must be "entirely inclosed." According to the dictionaries, the word "chamber" includes, not only a "compartment or inclosed space," but a "hollow or cavity," and a "recess" may be merely a "niche, alcove, or the like." "Internal" may mean only "situated or comprised * * * within an inner part or place." A chamber does not necessarily cease to be such by having an open door space or other opening therein. Not only do the claims say nothing about a "cover" for the mechanism, but no suggestion to that effect is found in either the drawings or the description of the invention. The description is only of a "rectangular cavity." Naturally a commercial ledger would be provided with some means for protecting the leaf body from the wear of the adjusting mechanism, and defendant's proposal to substitute a heavier flyleaf for the purpose suggests a view that such protection is the only advantage thought to be afforded by the cover flap. Its omission affects in no way the function, use, or operation of the mechanism. It scarcely need be said that the language of counsel, in describing plaintiff's mechanism, does not furnish a binding construction of the patent.

We think the claims interpreted according to their obvious meaning and as construed by the District Court call for an adjusting mechanism contained within a recess of the cover and arranged to be operated from the outside without the necessity of opening or uncovering the chamber; that is to say, without the necessity of access to the chamber from within for the purpose of such operation. Such is the reason and spirit of the invention as so construed. We find nothing in the Patent Office history, or in the distinction sought to be drawn between the patents of Bushong and Rosenthal, conflicting with this interpretation. We think the omission of the cover flap, at the most, a merely colorable change, and that it did not avoid infringement.

[5] Were plaintiffs in error properly convicted of contempt? Each had actual knowledge of the decree and injunction. All actively participated in the changing and marketing of the infringing

binders. The two respondents who were not parties to the original suit were thus properly parties to the contempt proceedings. Ex parte Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110.

We assume, in the absence of objection, that the petition is broad enough to cover contempt proceedings, both civil and criminal. But see, on this subject, Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 441, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; In re Kahn (C. C. A. 2) 204 Fed. 581, 123 C. C. A. 107; Phillips Co. v. Amalgamated Ass'n (D. C.) 208 Fed. 335, 342. Both aspects may properly be included in one proceeding. Kreplik v. Couch Patents Co. (C. C. A. 1) 190 Fed. 565, 571, 111 C. C. A. 381; Merchants', etc., Co. v. Board of Trade (C. C. A. 8) 201 Fed. 20, 31, 120 C. C. A. 582. The order in the instant case provided that one-half the fines imposed be paid to complainant as reimbursement for its damages, costs, and expenses in the contempt proceedings, including damages on account of the sale of the infringing binders in violation of the orders of the court. The individual defendants were ordered committed until payment of their respective fines, and execution was awarded against the corporation defendant for its fine. The order was of a civil nature so far as it was for plaintiff's benefit, as it clearly was to the extent of one-half the fines. True, plaintiffs in error were advised by counsel that the removal of the cover flap avoided infringement; but advice of counsel and good-faith conduct do not relieve from liability for a civil contempt, although they may affect the extent of the penalty. It is clear that the order, so far as it adjudged compensation to defendant in error here, was amply justified. Board of Trade v. Tucker (C. C. A. 2) 221 Fed. 305, 307, 137 C. C. A. 255.

As to the one-half of the fines impliedly to be paid to the United States purely as punishment, the judgment was of a criminal nature. Bessette v. W. B. Conkey Co., 194 U. S. 324, 332, 24 Sup. Ct. 665, 48 L. Ed. 997; Re Christiansen Engineering Co., 194 U. S. 458, 24 Sup. Ct. 729, 48 L. Ed. 1072; Gompers v. Bucks Stove & Range Co., supra; Re Merchants' Stock Co., 223 U. S. 639, 32 Sup. Ct. 339, 56 L. Ed. 584; Grant v. United States, 227 U. S. 74, 78, 33 Sup. Ct. 190, 59 L. Ed. 423; Brown v. Detroit Trust Co. (C. C. A. 6) 193 Fed. 622, 623, 113 C. C. A. 490; and cases cited. A willful and contumacious disregard of the injunction of a court is a criminal contempt; that is to say, where it indicates a contempt of the court and a disregard of its authority. Bessette v. W. B. Conkey Co., 194 U. S. at page 329, 24 Sup. Ct. 665, 48 L. Ed. 997; Doyle v. London Guarantee Co., 204 U. S. 599, 606, 27 Sup. Ct. 313, 51 L. Ed. 641; Merchants', etc., Co. v. Board of Trade, 201 Fed. at page 24, 120 C. C. A. 582. A mere violation of an injunction, however, if in a good-faith belief that the order is being properly interpreted, and without any intention to disobey or set at naught the order of the court, is not a criminal contempt, even though actuated by a desire to find a lawful means of avoiding infringement. But while in proceedings for criminal contempt the good faith of the respondents is material, as bearing upon the question whether the disobedience was willful and contumacious or otherwise, yet as the case is here on writ of error (and that is the only method of

review open—Bessette v. W. B. Conkey Co., supra; Re Merchants' Stock Co., supra; Grant v. United States, 227 U. S. at page 78, 33 Sup. Ct. 190, 57 L. Ed. 423) we are limited to the consideration of questions of law. The decision of the court below upon the facts is conclusive as to them (Bessette v. W. B. Conkey Co., 194 U. S. at page 338, 24 Sup. Ct. 665, 48 L. Ed. 997), unless, indeed, the record should permit a conclusion that the finding is unsupported by evidence.

[9] The primary question thus is, as respects the criminal feature of the order, whether the District Judge has found expressly or by necessary implication that the contempt adjudged was in fact willful and contumacious, and in purposeful disregard of the court's order, as it clearly would have been had respondents continued to market the condemned binders without change therein. Re Star Spring Bed Co. (C. C. A. 3) 203 Fed. 640, 122 C. C. A. 36. While the distinction between the civil and criminal features of the order is not clearly raised on the record, we think that under the authority existing in criminal cases to consider, even in the total absence of objection or exception, a case of plain error in a vital matter (Wiborg v. United States, 163 U. S. 632, 658, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289; Clyatt v. United States, 197 U. S. 207, 221, 25 Sup. Ct. 429, 49 L. Ed. 726; Crawford v. United States, 212 U. S. 183, 194, 29 Sup. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392; Morse v. United States [C. C. A. 2] 174 Fed. 539, 544, 98 C. C. A. 321, 20 Ann. Cas. 938), we should interpret assignments 1, 2, and 8 broadly enough to cover the point stated. The finding contained in the order is only "that the respondents    *    *    * are guilty of contempt." The opinion contains no finding of criminal contempt unless in the paragraph we quote in the margin.[2]

Counsel for plaintiff in error, having in mind the sentence beginning with the words, "Their avowed purpose has been to avoid infringement," say that "it would seem that the court regarded the respondents as having been in some sense contumacious, or disposed to set at naught the order of the court." But, taking the entire opinion into account, we seriously doubt whether the court intended to formally find respondents guilty of a willful, intentional, and contumacious disregard of the court's authority, constituting a criminal, as distinguished from a civil, contempt, especially in view of the fact that re-

[2] "Respondents make no attempt to plead ignorance as an excuse or the advice of counsel as a justification for their conduct. Their acts, whether innocent or otherwise, have been carefully planned and deliberately performed with a full understanding of the consequences to complainant and to themselves. They may have been mistaken as to the law of the case, but not as to the facts. Their avowed purpose has been to avoid infringement by a very narrow margin, to evade and sidestep the decision and mandate of this court with the least possible effort and inconvenience to themselves, and thus to render complainant's victory barren of beneficial results. Have they succeeded? Or, to put the question in a different form, does the slight modification or mutilation of the binder, effected by removing the cover flap, or manufacturing it without such flap, avoid infringement of the three patent claims in suit as such claims have been construed and interpreted by the opinion and decree of this court? If it does, the order of the court has not been disobeyed. If it does not, the injunction has been violated, and such violation is without excuse or justification."

spondents admittedly marketed the binders in question openly and upon the advice of reputable counsel that the change made avoided infringement, and was strictly within a proper interpretation of the decree. And unless the court's intent to find the contempt willful, intentional, and contumacious is reasonably clear, the feature in question should not be sustained, having in mind its nature as a criminal judgment, and the fact that it does not appear that the criminal aspect was expressly brought to respondents' attention, or treated separately from the civil feature, as was done in Kreplich v. Couch Patents Co., supra. We are therefore constrained to the view that the criminal portion of the judgment should be reversed. As to the effect of reversal in part, a similar, but not identical, question was passed without decision in Re Merchants' Stock Co., supra; but, in view of the separable nature of the civil and criminal features, we think the order, so far as it is purely remedial, should be affirmed.

### The Second Patent.

[7] In Bushong's first binder the thick rear edges of the covers lay directly over the binding edges of the leaf body, and in the process of opening and closing the book bore in direct frictional engagement upon the binding edges, thus tending to crowd the sheets rearwardly of the ends of the lids, and, if the binders were drawn taut, to give a "jerky movement," due naturally to the varying tension of the binding strips. Bushong's idea when the binder was first conceived was "to put two clamping bars pivotally hinged on the lids to protect the sheets from tearing out." His first binder omitted this feature, because at the time he "could not scheme out a way for hinging the clamping bars to the ends of the lid, and the proper arrangement of the binding cords in relation to the clamping bars." The distinguishing feature of patent No. 851,267 is Bushong's solution of this problem. He cut off the rear edge of each cover, so that it would not extend over the binding edges of the leaves, and attached to the rear end of each shortened cover a clamping bar; each bar being, as stated in the specification, "pivotally secured" by hinges to the cover, the bars being "preferably flat on their inner or clamping faces" and "preferably rounded on their rear or outer faces," so that "they may rock on their journals without engaging the inner edges of the covers." The clamping bars contain "transverse perforations" (through which the binding cords pass), terminating in "transverse slot-like cavities in the rear portions of the clamping bars to permit the same to rock freely on the binding cords." The specification states that "thus arranged, the covers may be opened without communicating the movement to the clamping bars"; that the "strain upon the binder and upon the leaves is reduced to a minimum"; and that the danger of tearing the leaves "which are thus clamped along their entire rear edge" is similarly reduced.

The claims in suit are 36, 39, 46, 47, 48, 49, 50, 51, and 52. Claims 36, 39, and 47 (printed in the margin [3]) are fairly typical. The par-

---

[3] "36. The combination with the covers; clamping bars pivotally connected to said covers; binding cords arranged through said clamping bars secured

ticular differences between the claims by groups may be thus summarized: Claims 36, 46, 47, 49, 51, and 52 specify "clamping bars pivotally connected to said covers."[4]   Claims 36, 39, and 46 provide for openings of such size through the clamping bars as to permit their rocking upon the cords independently of the covers, and the consequent independent movement of the covers and clamping bars when opening or closing the covers or the clamped sheets.  Claims 47, 49, 50, and 52 provide for openings in the bars for the binding cords of such size as to permit rocking of the clamping bars thereon, without special mention, however, of the independent movement of the covers and clamping bars with respect to each other.

Plaintiff's means for clamping the sheets thus embrace thick, rigid bars directly hinged to the covers, directly and positively bearing upon the binding edges of the sheets (not reached by the covers proper), the slots for the binder cords formed by the cutting away of the upper and inner surfaces of the bars operating to assure substantial identity of axial movement of cover hinges and binding cords, and thus to accomplish measurable uniformity of binding tension, in spite of the size, structure, and method of operation of the clamping members. The covers proper never bear directly upon the sheets, and are never over the binding edges of the sheets when the book is closed or when entirely open.  On the other hand, the thin rear edges of defendant's covers extend over the binding edges of the leaves and bear directly upon thin flexible, metallic plates strung through openings therein upon the binding strips, and always lying directly between covers and leaf body.  The covers are not hinged except by the binding strips. The clamping bars of the patent in suit are wholly lacking, unless the metallic plates mentioned are their equivalent.

The District Judge held the claims in suit valid, but not infringed. We agree with this conclusion.  In our opinion, defendant's structure differs from the device of plaintiff's patent not only in form and appearance, but in essential principle.  It lacks, in our judgment, not only the pivotal connection between the clamping bars and covers, but also

to one of said covers, the openings in said clamping bars for said binding cords being of such size as to allow the clamping bars to rock thereon independently of the covers whereby the covers and the clamping bars may move independently in opening or closing the covers or the sheets clamped by said bars; and means for adjusting said binding cords carried by the opposite cover."

"39. The combination with the covers; clamping bars; binding cords secured to one of said covers, arranged through said clamping bars, the opening in said clamping bars for said binding cord being of such size as to permit the rocking of the clamping bars thereon independently of the covers whereby the covers and the clamping bars may move independently in opening or closing the covers or the sheets clamped by said bars; and means for adjusting said binding cords carried by the opposite cover."

"47. The combination of the covers; clamping bars pivotally connected to said covers; binding cords arranged through said clamping bars and secured to one of said covers; the openings in said clamping bars for said binding cords being of such size as to permit the rocking of the clamping bars thereon and a screw for adjusting said binding cords carried by the opposite cover said binding cords being connected to said cover independently of said clamping bars; for the purpose specified."

[4] Claim 52 reads: "Covers pivotally connected to clamping bars."

the rocking movement of clamping bars upon binding cords and the independent movement of covers and clamping bars within a fair construction of the patent. While the movement of defendant's cover edge in the slightly concaved "wear plates" is in a sense pivotal (as was to a slight extent the movement of Bushong's cover edge on the binding edges of the leaves under his first construction), yet such movement is not in a proper sense the equivalent of the pivotal connection of plaintiff's patent, which is obviously the direct and positive hinged connection between clamp and cover; and while the openings in defendant's wear plates are slightly larger than the binding strips which pass through them, the slight movement which results when the book is manipulated, although in a sense rocking, is not the rocking and independent movement of plaintiff's bars, whose form is such as to require the peculiar slot specified in order to maintain constant pivotal relation. The openings in defendant's wear plates are not, in our judgment, in a proper sense the equivalent of the transverse slotted openings of plaintiff's bars. True, the object of both plaintiff's "bars" and defendant's "wear plates" is to prevent the covers from working the sheets from the binding strips when the covers are swung; and it is equally true that neither plaintiff's nor defendant's binders would be entirely successful commercially without some means of correcting this evil. It is also true that defendant's so-called wear plates are clamped between the covers and the leaves, and are the means through which the pressure of the cover edge is communicated to the leaf-body; but plaintiff's patent does not cover broadly the use of clamping means of any and every kind to protect the binding edges and slots of the sheets. Defendant's wear plates, moreover, are more accurately characterized as *clamped between* the cover and the leaves, as distinguished from the active and positive clamping effect of plaintiff's bars. Defendant has retained the covers extending over the binding edges of the sheets (rejected by Bushong after trial) and, by making the cover edges thin, has retained their positive and direct frictional bearing, as a clamping means, upon the leaf body, protected only by what is, in effect, a metal reinforcement of bearing surface of leaf and strip slot edges—which, so far as appears, would be equally effective if rigidly attached to the flyleaf or even to the outer sheet, and which, again so far as appears, Bushong could not effectively employ while retaining, as he did, his thick cover edges. It is thus not highly significant that Proudfit in his patent characterized what defendant now calls "wear plates" as "bearing strips," "binding strips," "binding bars," and "binder bars." Their function and effect are independent of nomenclature.

We conclude that although the claims in suit may perhaps be made literally to read upon defendant's structure, such result is accomplished only by a strained and unnatural interpretation of the claims, in violation of the spirit of the invention as disclosed by the patent.

### The Third Patent.

[8] The distinguishing feature of patent No. 878,340 is the so-called "quick-adjusting" mechanism, which as illustrated and as manu-

factured, is this: One end of each binding cord is attached to a cross-bar in one of the covers, mounted upon a ratchet or rackbar adapted to be engaged by a pawl seated upon the crossbar; the free end of the blade spring pivoted to the crossbar when swung in one position over the pawl holds it in engagement with the rackbar (thus preventing return movement of the crossbar); when the blade spring is swung to its other position it holds the pawl out of engagement. The blade spring is provided for its manipulation with a button-like finger piece projecting through a slot in the inner wall of the cover; another finger piece arranged to drop through the slot when not in use is pivoted on the crossbar; by grasping this last-named finger piece the bar may be moved along the rack to tighten the cords.

The binder containing this quick-adjusting mechanism may or may not contain (in the other cover) the key-locking mechanism of the first patent. The claims alleged to be infringed are Nos. 13, 14, 18, 19, 22, 23, and 24. The defenses are that claim 19 is invalid and that none of the other claims are infringed. The District Court held claims 13, 14, 19, and 24 valid and infringed, and claims 18, 22, and 23, valid, but not infringed.

Claims 22 and 23 are so clearly not infringed that they may be disposed of in a few words. Each of these two claims obviously contains as an element a crossbar in each of the two covers, to which crossbar the respective ends of the binding cords are secured. Neither of defendant's structures carries both the quick-adjusting and the key-adjusting devices. Neither has a crossbar (to which the binding strips are secured) in more than one cover, except defendant's binder style 2, which has in one cover its key-adjusting worm and crank mechanism, and in the other cover a crossbar to which the binding strips are attached, which does not contain the mechanism of the patent under consideration, but only a so-called "flop" mechanism, permitting merely a slight relaxation of the binding strips.

Laying aside for the present claims 18 and 19, and considering the remaining three claims: We print claim 13 in the margin.[5] Claim 14 differs from claim 13 in omitting the finger piece of the crossbar. Claim 24 differs from claim 14 (a) in describing the element to which the binding cords are connected as "an adjustable member" mounted on the ratchet bar, instead of as a "crossbar"; and (b) in omitting the "chamber" in one of the covers. Defendant's mechanism differs from the mechanism of the patent only in these respects: It has steel binding strips instead of leather; the crossbar to which the strips are attached is mounted upon a rackbar which has two rows of teeth; the locking element is a small plate mounted on the crossbar, having on its lower side teeth at each end to engage the double rack; the handle is pivotally and eccentrically mounted over the detent plate; when the handle is turned down forward and lying flat its lugs bear upon the

[5] "13. The combination with the covers, one of said covers having a chamber therein, of binding cords; a crossbar to which said binding cords are secured arranged in said chamber in said cover; a ratchet bar arranged in said cover; a pawl carried by said crossbar; means for disengaging said pawl from said ratchet bar; and a finger piece on said crossbar for the purpose specified."

plate, forcing it into engagement with the rack and locking against movement in either direction; when the handle is raised a spring underneath the plate is released and holds the latter out of engagement, permitting the crossbar to be moved by pulling directly upon the handle.

Infringement of claims 13, 14, and 24 is denied on the grounds: (1) That defendant's steel binding strips are not the binding cords of the claims; and (2) that defendant's mechanism is not the equivalent of plaintiff's pawl and ratchet bar. It follows from what we have already said in discussing the question of infringement of the first patent that, in our opinion, defendant's steel strips are the equivalent of plaintiff's binding cords.

We also agree with the District Court that defendant's mechanism, in all material and essential respects, operates in the same way, to accomplish the same result, as plaintiff's ratchet bar and pawl. True, a ratchet bar and pawl, according to strict definition and as plaintiff's binders are made, locks only against return movement; while defendant's rack and detent plate lock against movement in either direction; and again, plaintiff's pawl is capable of locking automatically as each tooth of the rackbar is passed, while defendant's mechanism does not automatically lock. But when the object and effect of the locking and releasing mechanism is considered, the differences stated are, in our opinion, in form rather than in substance; and as they produce no substantially new result infringement is not escaped (Veneer Mach. Co. v. G. R. Chair Co., recently decided by this court, and cases there cited), for the most (if not the only) important locking is against return movement; and while plaintiff's mechanism permits step by step locking, it is at least equally natural and convenient not to lock the pawl (previously released, as it must be to permit the slackening of the binding cords) so as to re-engage the rack until the cords are pulled taut.

[9] Turning to claim 18: It reads:

"The combination of the covers, one of said covers having a chamber therein; binding cords; an adjustable member to which said binding cords are secured, arranged in said cover; means for securing said adjustable member in its adjusted positions; and a finger piece pivoted on said member adapted to be swung down into the chamber when not in use."

The District Judge held claim 18 not infringed, for the reason that one of its essential elements is lacking in defendant's structure. We agree with this conclusion. The claim contains as one element "means for securing said adjustable member in its adjusted position," and as another element "a finger piece pivoted on said member adapted to be swung down into the chamber when not in use." In defendant's binder the one piece performs the functions both of a handle for pulling the binding strips taut and for securing and releasing the clamping mechanism, by turning the lugs so that they bear upon the detent plate. If defendant's device in question performs the functions of both elements of the claim, infringement would not be avoided by the mere fact that the separate pieces of plaintiff's mechanism were combined into one unitary structure, so long as each element operated in sub-

stantially the same way to produce substantially the same result.  Caster Co. v. Caster Co. (C. C. A. 6), 113 Fed. 162, 168, 51 C. C. A. 109; Eames v. Worcester Polytechnic Institute (C. C. A. 6) 123 Fed. 67, 72, 60 C. C. A. 37, and cases cited; Natl. Tube Co. v. Aiken (C. C. A. 6) 163 Fed. 254, 260, 91 C. C. A. 114; Herman v. Youngstown Car Mfg. Co. (C. C. A. 6) 191 Fed. 579, 586, 112 C. C. A. 185; Gould v. Cincinnati Shaper Co. (C. C. A. 6) 194 Fed. 680, 685, 115 C. C. A. 74.  And were it not for the clause in the claim which we have italicized above, we should probably be disposed to think that infringement had not been avoided.  But a necessary element of the claim is that the finger piece be "adapted to be swung down into the chamber when not in use."  In defendant's structure the so-called "finger piece" is adapted to be swung down into the chamber *only* when *in use*.

[10] True, this "use" is in locking the adjusting mechanism; but if it be said that the claim means that the finger piece be adapted to swing down into the chamber when not in use as a finger pull in drawing the binder strips taut, the answer seems obvious that the only object of swinging into the chamber the finger piece of the patent is to keep it out of the way when performing no function; and we cannot think that a structure which *requires* the swinging of the finger piece into the chamber in the performance of one of its functions, viz. locking the mechanism, and whose unlocking imperatively requires the removal of the finger piece from its "swung" position, is within the spirit even if within the letter of the claim.  We think, in other words, that defendant's binder lacks the "finger piece  *  *  *  adapted to be swung down into the chamber when not in use"; and a claim is not infringed if one of its elements is omitted without the substitution of an equivalent.  Cimiotti Unhairing Co. v. Amer. Fur Refining Co., 198 U. S. 399, 410, 25 Sup. Ct. 697, 49 L. Ed. 1100; Union Paper Bag Co. v. Advance Bag Co. (C. C. A. 6) 194 Fed. 126, 138, 114 C. C. A. 204; Underwood Typewriter Co. v. Royal Typewriter Co. (C. C. A. 2) 224 Fed. 477, 479, —— C. C. A. ——; Natl. Cash Register Co. v. Gratigny (C. C. A. 6) 213 Fed. 463, 465, 130 C. C. A. 109.  We think the equivalent lacking.

[11] Claim 19, which is the broadest of the claims in suit, is printed in the margin.⁶  It is assailed as invalid (a) because anticipated by Rosenthal, if the longitudinal bar of the Bushong patent is regarded as a guide only; (b) for lack of invention over the prior art generally; and (c) because of prior invention by Proudfit, if the claim is construed as requiring the longitudinal bar to act as an anchor to the crossbar as well as a guide.

It will be seen that the claim reads directly upon Rosenthal (see illustration in this opinion), provided his guides, which longitudinally engage the extension of his crossbar, are the equivalent of the "bar on which said crossbar is slidably mounted" of claim 19; for Rosenthal's notched bar is clearly an extension of his crossbar (especially in

---

⁶ "19. The combination with the covers, of binding cords; a crossbar to which said binding cords are secured; a bar on which said crossbar is slidably mounted carried by one of said covers; and means for securing said crossbar in its adjusted position on said bar."

view of the statement in his specification that it may be attached directly to the crossbar without the interposition of the spring); and in finding infringement of' other claims of the patent in suit we have regarded defendant's extension of its crossbar as the crossbar of the patent. Manifestly, mere reversal of parts so as to make Rosenthal's notched bar (crossbar extension) run *over and upon* instead of *through* his guides would not avoid infringement. Duner v. G. R. Railway Co., C. C. A. 6, 171 Fed. 863, 866, 867, 96 C. C. A. 531. If, then, the "bar on which" the "crossbar is slidably mounted" is merely a guide for the movement of the crossbar in tightening and loosening the. strips—unless, in other words, we can construe the claim as requiring the bar to carry an element of the locking mechanism—we think the claim anticipated by Rosenthal; for a bar which operates only as a guide would be but the equivalent of Rosenthal's guides. In view of the facts that 12 of the claims of Bushong's third patent expressly provide for a sliding of the crossbar on the ratchet (while others of the claims omit this feature), and that in his specification Bushong not only did not limit himself to his improvement as illustrated and described, but expressly claimed it "broadly," we think we are not justified in construing the broad claim in question as requiring that the bar on which the crossbar slides shall carry one element of the locking mechanism—notwithstanding in all of Bushong's reductions to practice his longitudinal bar performed that office. We think to so construe the claim would violate the general rule which forbids writing an element into a claim for the purpose of narrowing it, and thus making it valid as against objection that it is too broad in view of the prior art. McCarty v. Railroad Co., 160 U. S. 110, 116, 16 Sup. Ct. 240, 40 L. Ed. 358; Scaife v. Falls City Woolen Mills Co. (C. C. A. 6) 209 Fed. 210, 213, 126 C. C. A. 304; Natl. Cash Register Co. v. Gratigny (C. C. A. 6) 213 Fed. 463, 467, 130 C. C. A. 109; Veneer Mach. Co. v. G. R. Chair Co., 227 Fed. 419, —— C. C. A. ——, decided by this court November 2, 1915. For the reasons stated, we think claim 19 invalid. It is thus unnecessary to consider the' alleged priority of invention by Proudfit.

The decree below awarded injunction against defendant Proudfit, but denied his liability to account. This was the correct disposition. Proudfit's relation to the defendant company, including his organization and management of it, justified his being made defendant; but no individual infringement on his part, either before or after the company's organization, is shown. The paragraphs of the answers relied on do not amount to admissions of such infringement.

It results from these views that the decrees, so far as appealed from, in Nos. 2601, 2602, and 2604, should be affirmed, with costs to appellee or appellees respectively; that the decree, so far as appealed from, in case No. 2603, should be reversed, so far as it found claim 19 of the third patent valid and infringed, and that cause remanded to the District Court, with directions to enter decree of affirmance as to claims 18, 22, and 23; also affirming as to claims 13, 14, and 24, provided complainant within 30 days (or such further time as may be given by the District Court) after the filing of the mandate below file in the

court below a certified copy of a due disclaimer under claim 19, according to the practice recognized in Herman v. Youngstown Co., 191 Fed. 579, 587, 112 C. C. A. 185, and Houser v. Starr, 203 Fed. 264, 275, 121 C. C. A. 462; and that in No. 2645 the order should be affirmed, except as to the criminal feature, and as to that feature should be reversed and remanded, with directions to award a new trial—the costs of this court upon the writ of error to be divided.

## On Rehearing.

PER CURIAM. Rehearing is asked upon the ground that the patent in suit (No. 941,757) is invalid for lack of statutory oath specially directed to the particular claims in suit, which were added by way of amendment to the original application.

[12] We think the following considerations make this asserted ground of invalidity wholly untenable:

The subject-matter of the three claims in suit was, in our opinion, sufficiently disclosed by the original application, which was supported by the usual oath. Claim 13 was first introduced in another application made by Bushong, and was involved in interference proceedings between the latter and other applicants; it was later included in the application for the patent in suit, was made the subject of interference proceedings therein between Bushong, Proudfit, and two other applicants, and priority was awarded Bushong upon full hearing and consideration and through the successive actions of the examiner of interferences, the board of examiners in chief and the commissioner. Claims 14, 15, and 16, which are of scope similar to claim 13, were thereupon added.

It is, we think, fairly open to presumption that the Patent Office required no supplemental oath in connection with the amendment because of the disclosure of the invention in the application for the patent in suit, and because satisfied that the subject-matter of the amendment was invented by Bushong before the original application for the patent in suit was presented, and was a part of the original invention covered by that patent; and that Bushong was the first and sole inventor of such subject-matter—subjects with respect to which we entertain no doubt.

The history of the Patent Office proceedings (including the interference) precludes any suggestion of ignorance or of personal nonparticipation on Bushong's part with respect to the amendment by the addition of the claims in suit. Moreover, lack of supplemental oath was not raised in this cause by the pleadings.

These considerations, in our opinion, effectually differentiate the cases relied upon in support of the asserted invalidity.

The petition for rehearing is denied.