**TWM MANUFACTURING COMPANY, INC., and Turner Quick-Lift Corporation, Plaintiffs-Appellees,**

v.

**DURA CORPORATION and Kidde, Inc., Defendants-Appellants.**

Nos. 81–1530, 82–1265.

United States Court of Appeals, Sixth Circuit.

Argued March 24, 1983.

Decided Nov. 18, 1983.

Rehearing and Rehearing En Banc Denied Jan. 9, 1984.

See also, 6 Cir., 592 F.2d 346.

W. Robert Chandler, Cross, Wrock, Miller & Vieson, Detroit, Mich., James Van Santen, Kevin M. Guynn, Hill, Van Santen, Steadman, Chiara & Simpson, Chicago, Ill., for defendants-appellants in No. 81–1530.

Gordon D. Coplein, New York City, for defendants-appellants in No. 82–1265.

Shafer Orhan, Butzel, Long, Gust, Klein, Van Zile, Detroit, Mich., Geoffrey Myers, Pontamac, Md. (argued), for plaintiffs-appellees.

Before MERRITT and WELLFORD, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Appellee TWM Manufacturing Company, the owner of the Turner patent (No. 3,285,-621), brought this infringement suit against appellant Dura Corporation.[1] TWM claims that its patent, a design for a device to raise and lower an auxiliary axle and wheels, is infringed by Dura's Model 1400 series suspension. The district court held that the patent was valid and denied Dura's defense of laches and estoppel. The court granted TWM a permanent injunction prohibiting further infringement by Dura and ordered an accounting of the profits from the infringement. Nine months later, the court found Dura in criminal contempt for violating the injunction by selling spare parts for the suspension. The court assessed Dura with a fine and attorneys' fees. For the reasons stated below, we affirm the lower court's holding that the suit was not barred by laches and estoppel and that the Turner patent is valid. We hold, however, that although the court properly found that Dura had violated the injunction, the evidence fails to support a holding of criminal contempt.

I.

On November 15, 1966 Stephen Turner, Jr. was awarded U.S. Patent No. 3,285,621 for a "Wheeled Vehicle Suspension." Turner's device enables a truck to engage an additional axle and wheels to carry heavy loads. Airbags above the auxiliary axle are inflated to lower the wheels to the road surface. Two upwardly biased leaf springs attached to the vehicle frame at each end of the axle resist the axle as it is lowered. When the additional wheels are no longer required, the airbags are deflated and the springs raise the wheels above the road surface to decrease drag and reduce wear on the tires. When the auxiliary axle is engaged, the airbags and springs stabilize the suspension and act as shock absorbers.

In March 1965, Turner sent a copy of his patent application to the Dura Corporation, a manufacturer of truck suspensions. Dura received the application but never responded. In December 1966, several weeks after Turner received his patent, Dura began to advertise its 1400 series suspension. Later that month, Turner sent Dura a notice of infringement. More than six years later, in February 1973, TWM, which had acquired an exclusive license to the patent in 1969, filed an infringement suit against Dura.

On December 3, 1975 the district court granted Dura summary judgment on the grounds of laches and estoppel. The court held that the delay of more than six years in commencing the action was unreasonable and prejudiced the defendant, barring recovery by TWM. On appeal, this court reversed the district court's judgment and remanded the case with guidelines for applying the defenses of laches and estoppel. *TWM Mfg. Co. v. Dura Corp.*, 592 F.2d 346 (6th Cir.1979).

On remand, the case was tried before the court sitting without a jury. On May 21, 1981 the court delivered an opinion from the bench adjudging the Turner patent valid and holding that Dura had willfully infringed the patent. The trial judge held that Dura's failure to rebut evidence implying that it had copied the Turner patent precluded Dura from raising the defense of laches. The court also found that TWM committed no acts of misrepresentation that would estop its infringement claims against Dura. The district court perma-

---

1. Kidde, Inc. is the parent corporation of Dura and was joined as a party defendant pursuant to Rule 25(c), Fed.R.Civ.P.

nently enjoined Dura against further infringement and ordered an accounting of the damages.

The district court denied Dura's motion under Rule 62, Fed.R.Civ.P., to stay the injunction and damage determination. On appeal, this court affirmed the district court's denial of Dura's motion to stay the injunction pending appeal of the lower court's decision on the merits. This court, however, reversed the district court and granted Dura's request to stay the accounting procedures. Following this court's order, Dura posted a $5,000 supersedeas bond.

On March 5, 1982, in response to TWM's motion to hold Dura in contempt, the district court found that Dura had violated the terms of the injunction by selling repair parts for the model 1400 suspension. The court held Dura in criminal contempt, fined the company $10,000 and assessed it with $12,097.10 in attorneys' fees and expenses for TWM's costs of bringing the contempt action.

Dura appeals the district court's holdings that the Turner patent is valid and that the infringement suit is not barred by TWM's delay. Dura also appeals the holding of criminal contempt for violation of the injunction. These appeals were consolidated for argument and decision.[2]

## II.

### A. Patent Validity

■■■ Dura's principal argument is that the Turner patent is invalid because it is obvious to someone skilled in the art.[3] The ultimate question of obviousness is one of law. *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Reynolds Metals Co. v. Acorn Bldg. Components, Inc.,* 548 F.2d 155 (6th Cir.1977). The district court's determination of the factual predicates of obviousness are binding on

appeal unless the findings are clearly erroneous. *Armco, Inc. v. Republic Steel Corp.,* 707 F.2d 886, 888–89 (6th Cir.1983); *Minnesota Mining and Mfg. Co. v. Blume,* 684 F.2d 1166, 1172 (6th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983).

In its challenge to the district court's judgment that the Turner patent was not obvious, Dura contends that the court committed the following errors: (1) The court failed to make factual findings as required by *Hieger v. Ford Motor Co.,* 516 F.2d 1324 (6th Cir.1975), *cert. denied,* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976). (2) The court failed to consider evidence that would have shown that the Turner design was obvious to a person skilled in the art. (3) The court improperly discounted the testimony of Dura's expert witness, Robert Gottschalk. We have considered these alleged errors and find them without merit.

■■■ When a question of obviousness is raised, the district court must make factual findings regarding the "scope and content of the prior art," "the difference between the prior art and the claims at issue," and the "level of ordinary skill in the pertinent art." *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966); *Hieger,* 516 F.2d at 1327. Such findings need only be apparent from the court's opinion and need not be set forth specifically. *See Universal Elec. Co. v. A.O. Smith Corp.,* 643 F.2d 1240 (6th Cir.1981); *National Rolled Thread Die Co. v. E.W. Ferry Screw Prod.,* 541 F.2d 593 (6th Cir. 1976). The record shows that the trial court made findings that satisfy the requirements of the *John Deere* test, and we hold that none of these findings is clearly erroneous.

---

2. Dura does not appeal the district court's finding that its manufacture of the 1400 suspension willfully infringed the patent.

3. 35 U.S.C. §. 103 states:
   A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title [35 U.S.C. § 102], if the differences between

the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

The test for pertinent art is "similarity of elements, problems, and purposes." *Skega Aktiebolag v. B.F. Goodrich Co.,* 420 F.2d 1358, 1359 (6th Cir.), *cert. denied,* 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970). In defining the scope and content of prior art, the court considered three patents: Kulyk (No. 3,093,388), Hofmeister (No. 1,622,719) and Edginton (No. 1,388,809). Only Kulyk, the court held, was pertinent as prior art. Hofmeister uses air bags and opposing elliptic leaf springs to raise and lower sled runners beneath a vehicle, transforming an automobile into an "autoboggan." Edginton employs elliptic leaf springs and a simple lever to raise and lower a road scraper. The court held that these patents did not constitute prior art because their designs contributed nothing to solve the special problems of a liftable, auxiliary axle suspension. Testimony at trial established that the trucking industry had experimented with various ways to engage auxiliary axles and stabilize the load-carrying capacity of such systems. We do not believe that the court erred in limiting the prior art to developments within this field. *See Omark Industries, Inc. v. Textron, Inc.,* 688 F.2d 1242, 1248 (9th Cir.1982). The district court found that "it is clear that no one skilled in the suspension art would look to the dangerous contraption of Hofmeister to solve any problems in the axle-suspension art." This finding is supported by expert testimony in the record. The only relevance of the Edginton, the court held, was its use of a leaf spring. The court refused, we think properly, to extend the scope of prior art to "any device that uses a leaf spring in any way to raise and lower any other device."

The Kulyk patent, in contrast with the other patents cited by Dura, discloses a device to raise and lower an auxiliary axle. Kulyk employs air bags to lower an axle assembly which is raised by three coil springs and a torsion bar when the bags are deflated. The torsion bar runs across the width of the vehicle frame, and the springs are located at the middle of the axle. The device also uses shock absorbers to stabilize the wheels against lateral forces. The court found that Turner differed from Kulyk in that Turner's leaf springs serve the same function as the torsion bar, coil springs and shock absorbers in the Kulyk patent. The court concluded that Kulyk "represents nothing more than problems overcome by Turner." [4]

The trial court failed to make express findings regarding the level of ordinary skill in the pertinent art. This omission, however, is not reversible error for we are satisfied that the court adequately considered this element of the *John Deere* formulation. Implicit in the court's holding is a determination of ordinary skill. *See Universal Electric Co. v. A.O. Smith,* 643 F.2d at 1246–47; *Frantz Mfg. Co. v. Phenix Mfg. Co.,* 457 F.2d 314, 322–23 (7th Cir.1972). The district court expressly found that no one skilled in the art would look to Hofmeister to solve the problems of designing a load-bearing, auxiliary axle suspension. The court's consideration of the Kulyk patent and its finding that the patent "has no place in the historical development of lift axles" indicates that the court was aware of and was implicitly stating the engineering skill that had developed within the pertinent art.

As with all the elements of the *John Deere* test, Dura has the burden of proof on the issue of ordinary skill. *Armco Inc. v. Republic Steel Corp.,* 707 F.2d at 889–90. In this regard, Dura relies on evidence of the contemporaneous development of an unsuccessful hydraulic lift axle by Michael Bilas, an "ordinary trucker." If anything, this evidence is indicative of a non-specialized level of skill rather than professional training and expertise. Such a level of skill

---

4. Dura objects to the court's characterization of Kulyk as a paper patent. 'Paper patent' refers to a patent that was never used commercially. But the trial judge noted: "[A]lthough I agree that a paper patent can still be prior art, it is nonetheless a paper patent." This observation was not error. The commercial success of the Turner patent when compared to the Kulyk patent is a relevant, albeit secondary, consideration. *Kaiser Industries v. McLouth Steel Corp.,* 400 F.2d 36, 42 (6th Cir.1968).

is consistent with the court's evaluation of the pertinent art and the advantages of Turner's design. Thus, we cannot hold the finding of ordinary skill which implicitly informed the court's holding was clearly erroneous.

Dura argues that the trial court erred in failing to consider contemporaneous development of lift axles as evidence that the Turner device was obvious to someone skilled in the art. The Bilas design, as noted above, was a failure. It, like Kulyk, is noteworthy because it illustrated the problems that Turner overcame. Dura also contends that an inventor under its contract, Sam Verdi, developed the 1400 suspension just as Turner received his patent. Yet there is considerable evidence to suggest that Verdi plagiarized the Turner patent. The court's refusal to accept Dura's account of the origin of the 1400 suspension was not clearly erroneous.

Dura called as its only expert witness Robert Gottschalk. During cross examination, Gottschalk admitted that he was "of counsel" to Dura's law firm during the pendency of the infringement suit. In its opinion adjudging the Turner patent valid, the court found that the failure to disclose Gottschalk's position at the outset of his testimony cast "serious doubt upon the credibility of" his statements. The court held that the association with Dura's law firm was a "clear potential violation of DR 5–101 and DR 5–102 ... and because of this, and because I was not informed of his relationship, I am discounting and finding much of Mr. Gottschalk's testimony incredible."[5] Dura argues on appeal that this holding was an abuse of the court's discretion.

■ The trial court exercises broad discretion in its evaluation of expert testimony, and its findings are not to be disturbed unless clearly erroneous. *United States v. Green,* 548 F.2d 1261, 1268 (6th Cir.1977). Although some courts have permitted lawyers to testify on behalf of clients, the practice has been regularly criticized. *See,*

e.g., *United States v. Nyman,* 649 F.2d 208 (4th Cir.1980); *Waltzer v. Transidyne General Corp.,* 697 F.2d 130 (6th Cir.1983); *Lau Ah Yew v. Dulles,* 257 F.2d 744 (9th Cir. 1958). In *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.,* 546 F.2d 530, 539 (3d Cir. 1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977), the lower court was found to have erred by placing too much reliance on the testimony of a patent expert associated with the defense counsel. The court held, "We believe that, while a district court may in limited circumstances receive the testimony of a lawyer-witness, the value of such testimony must be discounted because of the interest of the lawyer or his firm in the outcome." 546 F.2d at 539–40. In this case, doubts about the value of Gottschalk's testimony were compounded by Dura's failure to disclose his relationship to counsel before his testimony. Accordingly, we hold that the court's assessment of Gottschalk's credibility was not an abuse of discretion.

■ The district court's holding that the Turner patent was not invalid for obviousness is a determination of law that is fully reviewable on appeal. *Westwood Chem. Inc. v. Owens-Corning Fiberglas Corp.,* 445 F.2d 911, 914 (6th Cir.1971), *cert. denied,* 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972). To pass the test of obviousness, a combination patent such as Turner must possess an "impalpable something," a "synergistic" effect such that the whole is greater than the sum of the parts. *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.,* 562 F.2d 365, 370 (6th Cir.1977). The evidence produced at trial shows that the trucking industry had long sought a method to temporarily engage an auxiliary axle. Various attempts to provide such a device proved impracticable or inefficient. Turner's design, incorporating elements which were already in use in axle suspensions, provided a simple, efficient, and complete solution to the problems encountered

---

5. Rules DR 5–101 and 5–102 of the Code of Professional Responsibility provide that a lawyer shall refuse employment or withdraw from a case if the lawyer "knows or it is obvious that he or a lawyer in his firm ought to be called as a witness. . . ."

in earlier attempts. The use of upwardly biased leaf springs provided the necessary lift while giving the unit lateral stability when the wheels were engaged with the road. The combination of the airbags and leaf springs provided what the industry refers to as an "air ride," a preferred form of shock absorption. Because the system could be installed without additional elements such as a torsion bar, hydraulic springs, or coiled springs, running across the width of the vehicle, the system could be used in the front of or in the rear of a drive or power axle. We agree with the district court that the Turner patent achieved synergism in a manner that was not obvious to someone skilled in the pertinent art. This holding is further supported by the immediate commercial success of the Turner design and its clear satisfaction of long felt needs in the industry. *Graham v. John Deere,* 383 U.S. at 17–18, 86 S.Ct. at 693–694. Therefore, we affirm the holding that the Turner patent is valid.

**B. Estoppel and Laches**

In *TWM Mfg. Co. v. Dura Corp.,* 592 F.2d 346 (6th Cir.1979), this court reversed the district court's award of summary judgment to Dura on the grounds of laches and estoppel. This court ruled that TWM's delay of more than six years in filing suit would bar any recovery only if the requirements of laches and estoppel were both satisfied. Although the delay created a presumption of laches, TWM could defeat the bar by: (1) rebutting the presumption of prejudice; (2) showing a good excuse for the delay; or (3) showing that Dura had "engaged in particularly egregious conduct which would change the equities in plaintiff's favor." 592 F.2d at 349. TWM's allegations that Dura plagiarized the patent, if proven at trial, would demonstrate egregious behavior and defeat Dura's claim of laches. *Id.* Laches alone, moreover, would bar recovery only of damages caused by the infringement before TWM filed suit. To defeat prospective relief, Dura must prove the elements of equitable estoppel. Estoppel requires, in addition to a showing of laches, "representations or conduct which justify an inference of abandonment of the

patent claims." Mere silence is not sufficient; the defendant must show "misrepresentation, affirmative acts of misconduct, or intentionally misleading silence by the plaintiff." *Id.* at 350.

On remand, the district court held that neither laches nor estoppel would preclude recovery by TWM. The court found "sufficient evidence of plagiarism which is egregious in this case" to defeat the bar of laches. With regard to estoppel, the court found no evidence of misconduct, misleading silence, or misrepresentations by TWM. On appeal, Dura argues that the court erred in making these determinations because the court improperly placed on Dura the burden of showing that it had not plagiarized the patent. The court, drawing support from a doctrine of copyright law, held that TWM's proof that Dura had access to the patent and that it had contemporaneously produced an infringing device, shifted the burden to Dura to prove the independent development of the 1400 system. Dura, the court found, failed to carry this burden.

Laches, an equitable doctrine, is left to the sound discretion of the trial judge. *Potash Co. v. Int'l Minerals & Chem. Corp.,* 213 F.2d 153, 155 (10th Cir. 1954). The doctrine's provenance is the conscience of the Chancellor, and its application is not governed by the rules of the common law. Within this wide scope, we must determine whether the trial court abused its discretion by finding the equities in TWM's favor because Dura could not rebut evidence of plagiarism.

Plagiarism, or the infringement of a common law copyright, may be shown by a finding of access taken together with the elements of similarity. *See Smith v. Little, Brown & Co.,* 360 F.2d 928, 930 (2d Cir.1966); *Herwitz v. National B'dcasting Sys.,* 210 F.Supp. 231, 235 (S.D.N.Y.1962). This rule avoids the unfairness that would result from requiring the plaintiff to prove the actual act of appropriating protected material. Direct evidence of copying is rarely, if ever, available. *Novelty Textile Mills v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 (2d Cir.1977). The appeal of this rea-

soning is found in *Graver Tank v. Linde Air Prod. Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), a decision cited by the district court in this case. In *Graver Tank,* the Supreme Court affirmed a lower court's finding of patent infringement based on the doctrine of equivalents. This doctrine provides that a device can infringe a nonidentical device if it performs substantially the same function in substantially the same way. If the defendant can provide no adequate explanation of the independent development of the allegedly infringing device, "the trial court could properly infer that the accused [device] is not the result of experimentation or invention." 339 U.S. at 612, 70 S.Ct. at 858.

■ We cannot hold that the trial court abused its discretion in ruling that evidence of Dura's plagiarism barred Dura from raising the equitable defense of laches. The court's shifting of the burden of proof to Dura was reasonable in light of the difficulties of proving the actual act of copying. The court's refusal to accept Dura's version of the development of the 1400 suspension is fully supported by the record.

■ We also affirm the district court's holding that Dura failed to prove the elements of equitable estoppel. Dura's failure to show laches also defeats its claim of equitable estoppel. Dura, moreover, cites on appeal no evidence that contravenes the lower court's finding that Turner had not engaged in intentionally misleading silence or affirmative misrepresentation. Therefore, we hold that neither laches nor estoppel bars TWM's recovery of damages in this case.

### III.

#### A. Violation of the Injunction

■ The district court's injunction prohibited Dura from "directly or indirectly making, using or selling or causing to be made" any device employing the patented features of the Turner suspension. The order further enjoined Dura

> (d) From actively inducing and/or contributing to the infringement of said patent by supplying to others the Model 1400 Series suspension or any material part thereof especial [*sic*] made or especially adopted [*sic*] for use in the Model 1400 Series suspension which part is not a staple article or commodity of commerce suitable for substantial non-infringing use.

This provision was taken from 35 U.S.C. § 271(c) which defines contributory infringement. For purposes of this appeal, we treat the scope of the injunction as coextensive with that of 35 U.S.C. § 271(c).[6]

Dura sold feather springs, brackets and other repair parts for its 1400 suspension after the injunction was entered on June 1, 1981. These sales continued until the court found Dura in criminal contempt for violating the injunction on March 5, 1982.[7] Dura does not deny that its sale of spare parts was contrary to the terms of the injunction, but it argues that the sale of these parts was nevertheless protected under *Aro Manufacturing Co. v. Convertible Top Co.,* 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) [hereinafter cited as *Aro I*] and *Aro Manufacturing Co. v. Convertible Top Co.,* 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) [hereinafter cited as *Aro II*].

In *Aro I,* a licensee of a combination patent for a convertible automobile top sought to enjoin Aro from producing and selling an unpatented component—the fabric—for repair of installed tops. The Court held that Aro could not be guilty of contributory infringement under 35 U.S.C. § 271(c) unless there was a direct infringement of the patent. Replacement of worn tops, the Court ruled, was a permissible repair of property, not a reconstruction of

---

**6.** 35 U.S.C. § 271(c) states:

Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

**7.** It is undisputed that the spare parts in issue were non-staple articles especially made or adapted for the 1400 series suspension.

the combination that would directly infringe the patent. Thus, the manufacture and sale of the replacement fabric did not contribute to a direct infringement of the combination patent. 365 U.S. at 341–45, 81 S.Ct. at 602–04.

The Court's holding in *Aro I* was narrowed by *Aro II* in a respect crucial to Dura's appeal. In *Aro II* the Court held Aro liable for selling fabric to any customer who owned a convertible manufactured by a company that was unlicensed to produce the convertible tops. Because the manufacture of these tops was unauthorized, the customers' use and even the repair of the structures directly infringed the patent. In *Aro II,* "as was not the case in *Aro I,* the direct infringement by the car owners that is a prerequisite to contributory infringement by Aro was unquestionably established." 377 U.S. at 486, 84 S.Ct. at 1532.

Because Dura never acquired a license to the Turner patent, *Aro II* would seem to dictate that Dura's sale of non-staple repair parts to owners of the 1400 series suspension was contributory infringement. Dura attempts to escape this conclusion by arguing that owners of its infringing suspensions received an implied license from TWM to use those devices. Dura relies on *Wagner Sign Service, Inc. v. Midwest News Reel Theatres, Inc.,* 119 F.2d 929 (7th Cir.1941) to argue that because the accounting order and supersedeas bond assured TWM of compensation for infringing units sold before June 1, 1981, owners of those units had received a constructive license to use and repair the suspensions.

We reject Dura's reasoning that its customers were licensed to use and repair the infringing suspensions. TWM has entered into no agreement with Dura releasing it or its customers from claims for infringement. Except for the supersedeas bond, TWM is in the same position as the patentee in *Union Tool Co. v. Wilson,* 259 U.S. 107, 42 S.Ct. 427, 66 L.Ed. 848 (1922). Wilson, a patentee who had been awarded an injunction and an accounting of damages, brought a contempt action against the original defendant for violating the injunction by selling spare parts. The Court upheld the contempt finding, ruling that Wilson had received no compensation which would license the use of the devices produced by the infringer.

Even if we were prepared to following the general ruling in *Wagner Sign,* this case is clearly distinguishable. There, the court held that a "supersedeas bond which assures the payment of all profits and damages" was equivalent to actual compensation. Yet the court noted "that no question is raised on the record but that the bond is ample to protect the plaintiff in any judgment." 119 F.2d at 930 n. 1. Dura's claim that the supersedeas bond assures TWM of compensation borders on the disingenuous. TWM asserts, and it is not disputed by Dura, that the $5,000 bond is far from sufficient to cover the expected award from the accounting. Dura, it should also be noted, never attempted to clarify to this court or to the district court its intention to treat the order and supersedeas bond as constituting a license. In its successful application to this court to stay the accounting, Dura suggested a $5,000 bond to cover the "nominal damages" resulting from the delay in the accounting. The amount of the bond should cover only these damages, Dura argued to this court, not the potential damages resulting from years of infringement. A bond established on such grounds provided TWM no assurance that it would recover damages as determined by the accounting. Because Dura failed to establish that the owners of the 1400 suspensions were licensed by TWM, Dura's sale of the spare parts was contributory infringement in violation of the terms of the June 1, 1981 injunction.

### B. Criminal Contempt

■■■ Dura contends that the court's finding of criminal contempt violated due process and Rule 42(b) of the Federal Rules of Criminal Procedure.[8] Dura argues that

---

**8.** The district court denominated the penalty as one for criminal contempt. We recognize, however, that a lower court's characterization of contempt proceedings is not determinative for purposes of appeal. *Lewis v. Baune,* 534 F.2d 1115, 1119 (5th Cir.1976); *United States v. Powers,* 629 F.2d 619, 626 (9th Cir.1980). Here, however, since there was a $10,000 fine

it received improper notice of the criminal charges and that the court failed to follow the procedures of Rule 42(b) in the prosecution of the contempt charge.[9] Dura also maintains that the evidence is insufficient to support a finding of criminal contempt.

TWM's motion and brief for a finding of contempt were served on Dura by first class mail on February 17, 1982. An accompanying Notice of Hearing stated that the motion would be heard on March 5, 1982. In the motion, TWM sought a decree holding Dura in contempt, "both civil and criminal," for violation of the June 1, 1981 injunction. TWM alleged that "Dura has been flagrantly violating the Injunction by continuously selling on numerous occasions, essential parts of the infringing '1400' since June 1, 1981." The brief asserted that "Dura and Kidde's willful violation of this Court's Injunction is shown beyond a reasonable doubt by the attached affidavit evidence." The attached affidavits included copies of invoices and packing lists showing that Benson Truck Bodies had ordered and received various repair parts for the 1400 suspension since June 1, 1981. In another affidavit, a sales manager for TWM stated that he had visited two customers of Dura who had ordered repair parts since the injunction was issued. In a supplement to its motion for a contempt decree dated March 3, 1982, TWM provided additional evidence that at least one other dealer had ordered and received repair parts and that Dura was advertising repair parts for sale at discount prices.

In its reply to the motion, Dura denied that supplying the repair parts was prohibited by the injunction. Dura also argued that "all those units out in the field are now under an implied license" because of the district court's judgment and award of an accounting. Dura asserted that the motion raised factual issues which could not be "treated summarily on a motion for contempt." Dura cited as an example of such a substantial issue the question of whether the parts alleged to have been sold were non-staple articles of commerce.

Attached to the reply was the affidavit of William S. Locke, president of Dura's division that manufactured the 1400 suspension. Locke stated his intention to comply in good faith with the injunction and asserted that the sale of repair parts was made pursuant to advice from Dura's patent attorney, James Van Santen. In a June 4, 1981 letter to Dura's management, which was also attached to the affidavit, Van Santen outlined his views on *Aro I* and *Aro II* and concluded that Dura was entitled to perform "permissible repair." Also attached to Dura's reply was an affidavit from the division's sales manager affirming that no complete suspensions had been sold and that "any sales of service parts have been for repair or replacement of existing 1400 suspensions."

At the March 5 hearing, the trial judge initially expressed the view that determination of the contempt motion would require a "testimonial hearing." The Judge, however, was assured by counsel for TWM that such a hearing was unnecessary because Dura had admitted to a "willful violation of the injunction" by the affidavits attached to its reply. The court then proceeded to make a determination on the basis of the

payable to the government, there is no question that the proceedings were criminal in nature. *Richmond Black Police Officers Asso. v. Richmond*, 548 F.2d 123, 125 (4th Cir.1977); *Douglass v. First Nat'l Realty Corp.*, 543 F.2d 894, 898 (D.C.Cir.1976). The fine in this case was punitive, not remedial, and was assessed to vindicate the authority of the court. *See In Re Timmons*, 607 F.2d 120, 124 (5th Cir.1979); *Carbon Fuel Co. v. United Mine Workers*, 517 F.2d 1348, 1349 (4th Cir.1975).

9. Rule 42(b) provides in part:
   A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. . . .

affidavits and arguments, to which Dura did not, at that time, object. The court found that springs and frame brackets for the 1400 had been sold since the injunction was entered. This finding was not contested by Dura. At the hearing, Dura limited its legal defense to its theory that the sale of repair parts was protected under *Aro I* and *Aro II,* and that, in any event, it had received an implied license to the patent.

We find no merit in Dura's argument that the court's procedures violated due process. Due process requires that the contemnor receive "reasonable notice of the specific charges and opportunity to be heard on his own behalf." *Taylor v. Hayes,* 418 U.S. 488, 499, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 897 (1973). The motion filed by TWM and the attached affidavits alerted Dura to the evidence and the charges that would be presented at the contempt hearing. *See Yates v. United States,* 316 F.2d 718, 723 (10th Cir.1963). At the hearing, Dura had an opportunity to contest TWM's allegations, but elected instead to rely on its legal defenses. This hearing clearly satisfied due process.

Dura maintains that the proceedings did not satisfy the requirements of Rule 42(b) because it never received a notice specifying what form of contempt would be considered. Dura also argues that it was never given formal notice of the charge by a U.S. attorney or appointed prosecutor as specified in the Rule. These failures, Dura argues, prejudiced its defense because, had the court complied with the Rule, Dura "could have requested a trial by jury" and "could have had witnesses at the hearing to testify regarding Dura's good faith in complying with the court's June 1st order."

■ Reversal of a conviction of criminal contempt is not the unavoidable result of a failure to comply precisely with the provisions of Rule 42(b). In *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947) the Supreme Court held that reversible error occurs only where the noncompliance produced substantial prejudice. Although Dura now argues that the improper notice hindered its defense on the charge of willfulness, Dura failed to make objections about the form of notice at the hearing.[10] We also seriously doubt that Dura was entitled to a jury trial.[11] Yet because we hold that the evidence does not support a finding of criminal contempt, we do not reach a determination of whether the court's failure to comply with all aspects of Rule 42(b) substantially prejudiced Dura.

■ In criminal contempt, willful disobedience must be proved beyond a reasonable doubt. *United States v. Powers,* 629 F.2d 619, 626 n. 6 (9th Cir.1980); *United States v. Greyhound Corp.,* 508 F.2d 529, 531 (7th Cir.1974). Willfulness, for this purpose, implies a deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent violation. *Falstaff Brewing Corp. v. Miller Brewing Co.,* 702 F.2d 770, 782 (9th Cir.1983). Applying this standard and viewing the evidence in the light most favorable to the court's holding, *see In re Joyce,* 506 F.2d 373, 376 (5th Cir.1975), we hold that there is insufficient evidence to sustain the order of criminal contempt.

■ Evidence produced at the hearing shows that Dura relied on the advice of its patent attorney, Van Santen, as expressed in his letter of June 4, 1981. In that letter, Van Santen recited the holding of *Aro I* and explained that "the repair or replacement of the worn out, damaged or de-

---

**10.** The Second Circuit has held that a contemnor may not raise on appeal the inadequacy of a contempt notice unless objection was made before the district court. *In re Liberatore,* 574 F.2d 78, 82 (2d Cir.1978). *See also Yates v. United States,* 316 F.2d 718, 724–25 (10th Cir.1963) (contemnor waived right to a plenary hearing by consenting to submit case to the court upon an agreed statement of facts).

**11.** In *United States v. R.L. Polk & Co.,* 438 F.2d 377 (6th Cir.1971), this court held that because a fine of more than $500 is defined as a non-petty offense under 18 U.S.C. § 1, a fine of $35,000 imposed on a corporation for criminal contempt entitled the corporation to a jury trial. This reasoning can no longer stand in light of *Muniz v. Hoffman,* 422 U.S. 454, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975) which held that a union had no right to a jury trial for a $10,000 fine for criminal contempt.

stroyed part is but an exercise of the right to 'give duration to that which [a customer] owns, or has a right to use as a whole.'" With regard to *Aro II,* Van Santen advised:

> Persons who purchased cars from Ford, which infringed the patent by manufacturing and selling them with the convertible tops structures, likewise were held to be infringers by using or repairing the top structures since the supplier of the replacement fabric for use in such infringing repair was a contributory infringer under Section 271(c) of the Patent Code, Ford being a nonlicensee at the time.

> Analogizing to your situation, it is as if a trucker with a lift would come in and ask you to replace the lift with a Model 1400.

> We are of the opinion you will be able to do "permissible repair" within those guidelines.

Notably absent from this advice is any explanation of why Dura was not in the same position as the supplier of replacement fabric in *Aro II* or why the fabric replacement in that case is analogous to the complete installation of an infringing system in this case. Also missing is any reference to posting a supersedeas bond to purchase an implied license, the linchpin of Dura's argument on appeal.

Although we have serious questions about the advice given Dura, there is no evidence to suggest that Van Santen's advice was not offered or was not used in good faith. In *Proudfit Loose Leaf Co. v. Kalamazoo Loose Leaf Binder Co.,* 230 F. 120 (6th Cir.1916), this court reversed a criminal contempt holding based on the violation of a court's injunction prohibiting further infringement of the plaintiff's patent. This court held that it is not a criminal contempt to violate such an order if the act is grounded on a "good faith belief that the order is being properly interpreted . . . even though

[the act] is actuated by a desire to find a lawful means of avoiding the infringement. . . ." 230 F. at 132. This court held that the evidence was insufficient to sustain a judgment of willful violation in light of the defendant's reliance "upon the advice of reputable counsel that the change made [in the infringing product] avoided infringement, and was strictly within a proper interpretation of the decree." *Id.* at 134. In this case, the record shows only that Locke relied on Van Santen's advice in his decision to ship parts for the 1400 suspension. There is no evidence of Locke's understanding of the legal arguments in the opinion letter nor is there any evidence regarding Van Santen's motives in offering the advice. Thus, we cannot sustain the court's holding that Dura willfully disobeyed the court's order beyond a reasonable doubt. We also reverse the award of attorney's fees based on this holding.[12]

■■■■■ Willfulness, however, is not an element of civil contempt. As our court noted in *Proudfit,* "advice of counsel and good faith conduct do not relieve from liability for a civil contempt, although they may affect the extent of the penalty." *Id.* at 132. Although civil contempt may serve incidentally to vindicate the court's authority, its primary purposes are to compel obedience to a court order and compensate for injuries caused by noncompliance. *McCrone v. United States,* 307 U.S. 61, 64, 59 S.Ct. 685, 686, 83 L.Ed. 1108 (1939); *Falstaff Brewing Corp.,* 702 F.2d at 778. The award of attorney's fees and expenses to a successful movant may be appropriate in a civil contempt proceeding. *See Chas. Pfizer & Co. v. Davis-Edwards Pharmacal Corp.,* 385 F.2d 533, 538 (2d Cir.1967). Accordingly, we must remand this case for further consideration of civil contempt consequences not inconsistent with this opinion.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and RE-

---

**12.** Our holding should not, of course, be interpreted to permit avoidance of criminal contempt as a matter of law simply by a showing of reliance on advice of counsel. On the other hand, if counsel's advice is so facially unreasonable as to support a finding of bad faith, a holding of criminal contempt may be proper without further evidence of bad faith. But where, as in this case, counsel's advice is confusing and incorrect and by itself cannot support a finding of bad faith on the part of contemnor, additional evidence of the intention of counsel and contemnor is necessary to sustain a holding of criminal contempt.

MANDED for proceedings not inconsistent with this opinion.