**Albert L. De GRAFFENRIED, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 541–80C.

United States Claims Court.

March 22, 1988.

Richard C. Conover, Bozeman, Mont., for plaintiff; Robert E. Isner, of counsel.

Michael J. Fink, with whom were Asst. Atty. Gen. John R. Bolton and Vito J. Di-Pietro, Director, Washington, D.C., for defendant.

### ORDER

ANDEWELT, Judge.

In this patent action brought pursuant to 28 U.S.C. § 1498, plaintiff, Albert L. de Graffenried, seeks compensation from the United States for the alleged unauthorized use of the invention claimed in United States Patent No. 3,217,568 (the '568 patent).[1] Plaintiff alleges that the patent cov-

ers a device used by the U.S. Army in the manufacture of artillery gun barrels at the Watervliet Arsenal in Watervliet, New York (the Arsenal).

The case is presently before the Court on defendant's motion for summary judgment on the ground of laches, and on plaintiff's cross-motion under RUSCC 11 for the attorney's fees incurred in resisting defendant's motion. For the reasons set forth herein, both motions are denied.

### Background

One method of manufacturing a gun barrel is to gradually feed a boring tool into one end of a rotating metal cylinder so as to hollow and shape the cylinder into a gun barrel. A problem confronted when this method of manufacture is used, however, is that the boring tool tends to drift at random from the center line of rotation—a phenomenon known as "runout." On May 23, 1962, plaintiff applied for a patent on a device known as a "runout controller" that improves the accuracy of boring operations by sensing the magnitude and direction of runout and supplying appropriate force to keep the boring tool centered. That patent application was issued as the '568 patent on November 16, 1965.

On June 1, 1962, shortly after plaintiff filed his patent application, the Arsenal, which manufactures high caliber gun barrels, issued a "Request for Technical Proposals" for a runout controller. Responses were received from Flight Command Association, Inc. (FCA), a company principally owned by plaintiff, and from Bergen Research Engineering Corp. (Bergen). FCA's proposal apparently described a runout controller that employed an accelerometer and associated electronic circuitry to signal the magnitude and direction of runout, and electromagnets that responded to such signals by making appropriate changes in the angle of the boring tool. It is undisputed that FCA's technical proposal described at least some elements of the runout control-

---

1. The '568 patent is entitled "Device for Controlling Deep Boring Operations in a Rotating Ob- ject."

ler disclosed in the '568 patent.[2] Bergen proposed a different structure that employed a taut wire extending along the axis of the gun barrel to guide the cutting head, and hydraulic pistons to keep the cutting head in line with the taut wire. On December 18, 1962, the Arsenal awarded the contract to Bergen, the low price bidder.

Technical problems subsequently arose with the Bergen design, however, one of which was that the taut wire system proved ineffective for controlling runout. The Bergen and Arsenal engineers then decided to switch to the use of accelerometers for runout detection. Bergen modified its design to include such an accelerometer system and delivered the resulting device to the Arsenal for testing on January 29, 1964.

In early 1965, the Arsenal began development of an operational runout controller. William A. Wondisford, an Arsenal engineer, was given responsibility for the project. In July 1966, plaintiff advised Mr. Wondisford of the issuance of the '568 patent, and, in November 1966, inquired about possible infringement of that patent by the runout controller being developed at the Arsenal. In a November 22, 1966, letter, an attorney for the Arsenal advised plaintiff that it was the opinion of persons at the Arsenal that the Arsenal equipment did not infringe plaintiff's patent.

The runout controller which is the subject of this action was first assembled at the Arsenal in January 1967, when a lathe at the Arsenal was adapted to use a runout controller that utilized accelerometers. Thereafter, plaintiff made several requests for compensation, including the filing of two administrative claims in which he alleged that the '568 patent covered the runout controller in use at the Arsenal. Plaintiff also requested permission to inspect the Arsenal runout controller, and offered the Arsenal a license under the patent in exchange for $1.00 and the right to demonstrate the equipment to prospective licensees. The Arsenal initially consented to the inspection, but when plaintiff and his attorney arrived at the Arsenal on the scheduled date, they were denied access to the equipment. The reason given by the Arsenal was that it had obtained the advice of a patent specialist and, based on that advice, had determined that there was no infringement of plaintiff's patent.

In a March 25, 1968, letter, the Arsenal formally denied plaintiff's first administrative claim, which had been filed on May 2, 1967, on the grounds that the Arsenal device differed from plaintiff's patented invention in several respects. The denial letter contained a description of the accused device and presented a claim-by-claim comparison of that device and the invention disclosed in the '568 patent. Plaintiff again raised the issue of possible infringement in a March 16, 1970, letter in which he alleged that he had a statement from a Bergen engineer that the Arsenal's equipment was "a direct and unquestionable infringement of [the '568] patent." In that letter, plaintiff proposed that the Arsenal consider procuring a second runout controller (in addition to the Bergen device) from his company and accept his offer of a license of the '568 patent to cover use of both devices. Plaintiff stated in the letter that acceptance of this proposal would be "an excellent way for [the Arsenal] to recover its position and avoid direct legal action in a civil court." The Arsenal rejected the offer on April 8, 1970, indicating that it had reviewed the status of the procured Bergen device, but had found no change in the facts that would warrant reconsideration of its denial of plaintiff's first administrative claim.

More than seven years later, on May 26, 1977, an article appeared in the Times Union newspaper that indicated that Mr. Wondisford, the Arsenal's runout controller project engineer, had received a prestigious national award for development of a guided boring system which had allegedly saved the U.S. Army $2.8 million in the manufac-

---

**2.** Defendant characterizes certain of plaintiff's factual contentions, such as those pertaining to FCA's technical proposal, as "misleading" or "immaterial." However, defendant does not dispute the correctness of such contentions. For purposes of the instant motion for summary judgment, such factual contentions are deemed established.

ture of its heavy weapons. The article briefly described "the Wondisford system" as "an electronically-controlled, hydraulically-activated tooling system which guides a boring head through a cannon barrel with accuracy of five-thousandths of an inch." Plaintiff thereafter requested, and was granted, an opportunity to inspect the runout controller in use at the Arsenal. After the inspection, plaintiff filed a second administrative claim, which was denied on October 1, 1980.

Plaintiff instituted this action on October 6, 1980, and filed his pretrial submission on May 3, 1983. Defendant filed its pretrial submission on February 20, 1985, and the instant motion for summary judgment on the ground of laches on April 9, 1987. On June 18, 1987, plaintiff opposed defendant's motion, and cross-moved for the sanction of attorney's fees under RUSCC 11.

## I. Defendant's Motion for Summary Judgment on the Ground of Laches

### A. *The Applicable Standards*

■ Laches is an equitable defense. As applied in patent cases, it bars recovery of damages for any infringement occurring prior to the filing of the suit. *Jamesbury Corp. v. Litton Indus. Prod. Inc.*, 839 F.2d 1544, 1551 (Fed.Cir.1988). A defense of laches is potentially available when the defendant can establish (1) an unreasonable and inexcusable delay in filing suit, and (2) material prejudice to defendant resulting from the delay. *Id.*, at 1551–1552; *Bott v. Four Star Corp.*, 807 F.2d 1567, 1575 (Fed. Cir.1986); *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741 (Fed.Cir.1984). The period of delay is measured from the time the patent owner knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity. *Jamesbury Corp.*, at 1552; *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 616 F.2d 1315, 1326 (5th Cir.1980), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). Where a defendant establishes a delay of more than six years, a rebuttable presumption arises both that the delay was unreasonable and that it prejudiced the defendant. The burden then shifts to the patent owner to prove the existence of a reasonable excuse for the delay, and the lack of prejudice to the defendant. *Jamesbury Corp.*, at 1552; *Bott*, 807 F.2d at 1575; *Leinoff*, 726 F.2d at 741–42.

■ A defendant that establishes unreasonable delay and prejudice does not necessarily prevail on a defense of laches, however. As an equitable defense, laches is primarily addressed to the discretion of the trial court, and its existence ultimately must be determined based on the court's view of the overall equities in the case. *Jamesbury Corp.*, at 1551; *Bott*, 807 F.2d at 1576. In this regard, courts have denied a defense of laches where the defendant established unreasonable delay and prejudice but was found to have engaged in egregious conduct. See, *e.g.*, *Bott*, 807 F.2d at 1576; *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1268 (6th Cir.1983), *cert. denied*, —— U.S. ——, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986). Deliberate copying of a patented invention is the type of egregious conduct that can tip the equities against a defendant asserting laches. See *Bott*, 807 F.2d at 1576; *TWM Mfg.*, 722 F.2d at 1268–69; *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 429–30 (E.D.Pa.1980).

■ As with any other motion for summary judgment filed under RUSCC 56, a motion for summary judgment on the issue of laches is appropriately granted only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Jamesbury Corp.*, at 1548–49. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). In deciding a motion for summary judgment, the Court "must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor and must resolve all doubt over factual issues in favor of the party opposing summary judgment." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir. 1985) (*en banc*) (citations omitted).

## B. *The Parties' Contentions*

 Defendant bases its motion for summary judgment on the over 12–year period from the denial of plaintiff's first administrative claim in 1968 to the filing of the instant suit in 1980. Defendant contends that this time period raises a presumption of unreasonable delay and prejudice which plaintiff has failed to overcome. In response, plaintiff contends that the laches defense should be denied because the Arsenal personnel engaged in egregious conduct.[3]

Plaintiff presents essentially a two-pronged argument with respect to egregious conduct. First, plaintiff argues, in effect, that defendant intentionally copied his invention and then, without authorization, used the invention without compensating him. Second, plaintiff alleges that the Arsenal personnel engaged in an intentional effort to mislead and deceive him into believing that the '568 patent did not cover the boring device that was in use at the Arsenal.

 With respect to the first prong, as noted above, deliberate copying of a patented invention may constitute egregious conduct sufficient to defeat a defense of laches. See *Bott,* 807 F.2d at 1576; *TWM Mfg.,* 722 F.2d at 1268; *Anaconda Co.,* 485 F.Supp. at 429. Here, defendant has admitted that the Arsenal received notice of the issuance of plaintiff's patent in July 1966, approximately six months before it assembled the accused boring device. A demonstration that an alleged infringer had access to a patent and contemporane-

ously produced a device covered by that patent can create a presumption of copying that shifts the burden to the defendant to prove independent development of the device. See *TWM Mfg.,* 722 F.2d at 1268. Accord, *Bott,* 807 F.2d at 1576.[4]

 But plaintiff's contention here goes beyond alleging mere access to the patent and contemporaneous production. Plaintiff also contends, in effect, that he disclosed the idea behind his invention to the Arsenal well before the issuance of his patent, and that when the Bergen design failed, defendant knowingly replaced it with plaintiff's invention. There is some support for this contention in the record. For example, it appears that as early as 1962, plaintiff revealed to the Arsenal some elements of the invention ultimately disclosed in the '568 patent, including the use of an accelerometer for runout detection, and that when problems arose with the taut wire system in the original Bergen device, the Arsenal modified that device to incorporate an accelerometer. Plaintiff certainly has not yet demonstrated that the '568 patent covers the Arsenal device, much less that his invention was copied. But this Court must view this evidence in the light most favorable to plaintiff, and all doubt over the existence of factual issues must be resolved in plaintiff's favor. *SRI Int'l,* 775 F.2d at 1116. Under this standard, plaintiff has succeeded in establishing the existence of a genuine issue of material fact as to whether defendant intentionally copied his invention.

---

3. Plaintiff also contends that his delay in filing suit was excusable because "during the period 1970–1977, [he] had insufficient funds to spend in bringing a lawsuit for patent infringement, and in addition, was led to believe by statements made by personnel at the Watervliet Arsenal that the Arsenal device did not infringe [his] patent." With respect to plaintiff's financial resources, the courts generally have held that a lack of funds does not excuse delay in filing suit. See, *e.g., Hayward v. National Bank,* 96 U.S. (6 Otto) 611, 618, 24 L.Ed. 855 (1877); *Casey v. United States,* 226 Ct.Cl. 584, 586 (1981); *Naxon Telesign Corp. v. Bunker Ramo Corp.,* 686 F.2d 1258, 1261 (7th Cir.1982). With respect to plaintiff's contention that he relied upon the statements of the Arsenal personnel, as noted

above, the period of delay is measured from the time the patent owner knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity. *Jamesbury Corp.,* at 1552. Plaintiff and his counsel apparently were informed in 1970 by a Bergen engineer that the Arsenal's equipment was "a direct and unquestionable infringement" of the '568 patent. This notice would appear sufficient, even in the face of the Arsenal's denials of infringement, to trigger plaintiff's obligation to exercise due diligence to determine if his patent covered the accused device.

4. Defendant does not address the issue of "independent development" in the instant motion.

The second prong of plaintiff's egregious conduct argument is based primarily on the Arsenal's abrupt cancellation of the previously arranged inspection tour, and on the March 25, 1968, letter in which the Arsenal set forth the basis for its conclusion that its device was not covered by plaintiff's patent. Plaintiff contends, in effect, that the statements and conclusions in the March 25, 1968, letter misrepresent the structure of the Arsenal runout controller, and that the inspection was canceled to hide from plaintiff its true structure. Defendant denies each of these assertions, contending that the March 25, 1968, letter is accurate, and that the inspection was canceled because of the Arsenal's determination, later expressed in the March 25, 1968, letter, that the Arsenal device was not covered by the patent.[5]

It is not possible at this juncture to determine the accuracy of the statements made in the March 25, 1968, letter. The parties' differing contentions on this point are inherently intertwined with the merits of plaintiff's claim that the '568 patent covered the Arsenal device. For example, to assess the accuracy of the statements and conclusions in the letter, it apparently will be necessary to understand the structure and operation of the Arsenal device as well as the scope of the '568 patent. These issues have not been briefed in connection with the instant motion for summary judgment.

It should be noted, however, that even if this Court ultimately decides that the accused device was covered by the '568 patent, that in itself would not necessarily mean that a letter stating the opposite conclusion was written in bad faith or otherwise constituted egregious conduct. There is certainly room for good faith disagreement on issues involving infringement or coverage of a patent. To establish egregious conduct sufficient to defeat defend-

ant's laches defense, plaintiff will have to demonstrate bad faith conduct by the Arsenal personnel. It will not be sufficient for plaintiff to establish merely that the conclusions expressed in the March 25, 1968, letter are incorrect.[6]

In sum, when the evidence is viewed in its entirety and all reasonable inferences are drawn in favor of plaintiff, there exists a genuine issue of material fact as to whether the Arsenal personnel intentionally copied plaintiff's invention or otherwise engaged in egregious conduct. Plaintiff should recognize, however, that it is a long road from raising a factual issue as to egregious conduct to establishing egregious conduct at trial. Indeed, there is a strong presumption in this Court that the actions of Government officials are undertaken in good faith. See *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 64–65, 617 F.2d 590, 597 (1980); *Laka Tool & Stamping Co. v. United States*, 7 Cl.Ct. 213, 218 (1984).

## II. Plaintiff's Motion for Attorney's Fees

In his motion under RUSCC 11, plaintiff seeks to recover the attorney's fees he incurred in responding to defendant's motion for summary judgment. RUSCC 11, in pertinent part, requires that every paper submitted to the Court by a party represented by an attorney be signed by the attorney, and that the signature of the attorney constitutes a certificate by him—

> that to the best of his knowledge, information, and belief formed after reasonable inquiry [the paper] is well grounded in fact and is warranted by existing law … and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

RUSCC 11, which essentially mirrors Rule 11 of the Federal Rules of Civil Procedure,

---

5. In addition, Bergen had apparently expressed concern that an inspection of the Arsenal equipment would disclose proprietary material.

6. At this point, it appears that the only indication of possible bad faith on the part of the Arsenal personnel in sending the March 25, 1968, letter is the evidence pertaining to the alleged copying of plaintiff's invention. If the Arsenal personnel did in fact copy plaintiff's invention, then the intentions behind the March 25, 1968, letter, which unequivocally denies infringement, would certainly be suspect.

mandates imposition of an appropriate sanction, such as an order to pay attorney's fees, whenever a paper is filed in violation of the rule.

Here, although maintaining that defendant's summary judgment motion should be denied on the merits, plaintiff does not suggest that defendant's motion is not well grounded in fact and law. Rather, plaintiff relies on the clause in RUSCC 11 which proscribes the filing of papers "for [an] improper purpose." Plaintiff contends that defendant's counsel violated this proscription by filing the motion for summary judgment on the "eve of trial" with the purpose of delaying the setting of a trial date.

Plaintiff has failed to demonstrate any improper purpose here. Plaintiff has not demonstrated any improper intent on the part of defendant's counsel in filing the instant motion for summary judgment. Nor do the circumstances surrounding the filing of defendant's motion, objectively viewed, evince any improper purpose. The only evidence presented by plaintiff of the alleged improper purpose is that which suggests that defendant's counsel was aware of the facts which form the basis of its motion several years before filing it.[7] But proof of knowledge of such facts alone does not demonstrate an improper purpose on the part of defendant or its counsel.

First, it is not apparent that defendant's counsel in fact had evaluated the available evidence and made the determination to move for summary judgment substantially in advance of the date when the instant motion actually was filed.[8] Next, the motion in question here was potentially dispositive and if granted, rather than delaying trial, would have obviated the need for a trial and thereby conserved substantial re-

sources of this Court and of the parties. Moreover, the motion is relatively straightforward and would not necessarily be expected to result in any substantial delay of proceedings. In addition, the decision to defer the setting of a trial date in this case was made by the judge to whom this case was previously assigned, apparently after considering the very concerns plaintiff raises here.[9]

### Conclusion

For the foregoing reasons, it is hereby ORDERED:

1. Defendant's motion for summary judgment and plaintiff's motion for sanctions under Rule 11 are each denied.

2. On or before April 25, 1988, the parties shall file a joint status report that proposes a schedule for any remaining pretrial matters, and a date and place for trial.

---

7. The proposed findings of fact filed in connection with defendant's summary judgment motion were essentially drawn from plaintiff's pretrial submission, which was filed in May 1983.

8. Even assuming that a party did decide to defer filing a dispositive motion until its case was ready for trial, such a decision obviously could be for entirely legitimate purposes. For example, the party may wish to review a completed discovery record before moving for summary judgment on one particular ground.

9. At a status conference held on March 3, 1987, defendant gave advance notice that it intended to move for summary judgment on the issue of laches. Plaintiff objected, alleging, as he does now, that the purpose of defendant's motion was to delay the commencement of trial. The Court nevertheless permitted defendant's motion to be filed, took the motion under consideration, and decided to defer setting a trial date until such time as the motion was resolved.